C. F. BRAUN & CO.; Robert L. Scott; Jones & Pellow Oil Company; Robert S. Bowers; Virgil Boll; John Reinhart; and Jim Biddick, Appellants,

v.

The CORPORATION COMMISSION of the State of Oklahoma and Leonard S. Fowler, Appellees.

No. 51673.

Supreme Court of Oklahoma.

March 25, 1980.

H. B. Watson, Jr., Richard K. Books, Oklahoma City, for appellants.

Robert J. Emery, Oklahoma City, for appellee Leonard S. Fowler.

IRWIN, Vice Chief Justice.

The Oklahoma Corporation Commission (Commission) established thirteen separate common sources of supply under a 640 acre tract.[1] These thirteen separate common sources of supply had been spaced and constituted thirteen separate and distinct drilling and spacing units within the 640 acre tract. Leonard S. Fowler, appellee, filed an application to pool the thirteen common sources of supply or spacing units in the 640 acre tract under 52 O.S.1977 Supp., § 87.-1(e). Appellee proposed to drill a test well to the Hunton formation which was 13,500 feet below the surface. Appellants, owners of some leasehold interests under the 640 acre tract, proposed to drill a test well to the Morrow Sand which was 11,000 feet.

The Commission, after hearing, entered its pooling order which scheduled a cash bonus or overriding royalty for each formation if an owner elected not to participate in the costs in all the formations. Or, an owner could elect to accept the cash bonus as to certain formations and participate in the costs as to other formations, provided, however, "that any election to drill to a specified formation, shall, by implication, include the election to drill to any and all formations shallower than said specified formation."

---

1. Extension orders were granted in Cause No. 50229 and at time the pooling application was filed the following formations, listed in order of depth, had been established as common sources of supply: Douglas (Upper Tonkawa), Tonkawa (Lower Tonkawa), Cottage Grove, Cleveland, Big Lime, Oswego, Cherokee, Atoka, Morrow Sand, Springer Sand, Chester, Mississippi-Meramec, and Hunton.

That portion of the order which provided for the apportionment of costs required the owners electing to participate in the Morrow Sand to pay:

$$75\% \times \frac{11,000}{\text{Total Depth of Well in Feet}} \times \text{Total Cost to Casing Point}$$

and all participating owners, who elected to join in the well for a test below the Morrow Sand were required to pay, in addition to their proportionate share of the above costs, the entire costs of drilling and testing below the Morrow Sand on the following basis:

$$25\% \times \frac{11,000}{\text{Total Depth of Well in Feet}} \times \text{Total Cost to Casing Point}$$

Plus

$$\frac{\text{Total Depth of Well in Feet minus 11,000}}{\text{Total Depth of Well in Feet}} \times \text{Total Cost to Casing Point}$$

Under the above formula, (1) if a well is drilled only to the Morrow Sand (11,000′), all participating owners will pay their proportionate share of the costs, (2) if the total depth is 13,500 feet, which the evidence indicates is the depth sufficient to test the Hunton, owners who elect to participate only in the Morrow Sand, will pay their proportionate share of 61.11% of the total costs, and (3) owners who elect to participate in the Hunton will pay their proportionate share of the 61.11% above set forth, and in addition thereto, the balance of the costs or 38.89% of the total costs.

Appellants elected (1) to accept the cash bonus for each of the eight formations above the Morrow Sand (totalling $67.90 per acre) (2) to participate in the costs for the Morrow Sand, and (3) to accept the cash bonus and excess override in the formations below the Morrow Sand.[2]

Appellants' election was contrary to the Commission's pooling order because under the order, appellants' election to participate in the Morrow Sand, by implication, included an election to participate in the eight shallower formations. Therefore, under the order, appellants were not entitled to a cash bonus for each of the eight formations above the Morrow Sand in view of their election to participate in the Morrow Sand.

Appellants' first specification of error is directed to that part of the pooling order which provided that an election to participate in the costs to a specified formation included, by implication, an election to participate in all shallower formations. Appellants contend that since appellee's application to pool included all thirteen common sources of supply underlying the 640 acre tract, and the Commission pooled all thirteen, the Commission's order was erroneous because it did not allow an election as to each common source of supply.

Appellee contends that 52 O.S.1977 Supp., § 87.1(e) does not require a separate election for each separate and distinct common source of supply underlying the same 640 acre tract. Appellee says that if such construction is now placed on our pooling statute "there will be a whole new ball game" at the Commission, and therefore, a new ball game in the industry itself. Appellee recognizes the Commission is authorized to provide for an election as to each common source of supply, but contends that a pooling order must be "just and reasonable" and based upon the facts and circumstances in each case. Appellee argues in determining whether the pooling order in the case at bar is valid, this court should keep in mind that only working interests are involved and that appellants proposed to drill a well to a depth sufficient to test the Morrow Sand, whereas appellee proposed to drill to a depth sufficient to test the Hunton Lime.

The Commission has "the power to establish well spacing and drilling units . . . covering any common source of supply." 52 O.S.1977 Supp. § 87.1(a). In establishing a well spacing or drilling unit for a common source of supply, the acreage to be embraced within each unit shall not exceed a specified number of acres, depending upon certain factors. § 87.1(c). When two or more separately owned tracts of land are embraced within an established spacing unit, or where there are undivided interests embraced within such unit, the owners

2. Appellants, in their Letters of Election, noticed they were required to elect within 15 days of the pooling order and they planned to appeal to the Supreme Court. All elections were made subject to their appeal.

thereof may validly pool their interests and develop their lands as a unit. In case the owners cannot agree, the Commission, upon proper application and hearing shall require such owners to pool and develop their lands in the spacing unit as a unit. "All orders requiring such pooling shall be made upon such terms and conditions as are just and reasonable." 52 O.S.1977 Supp. § 87.1(e).

As we view our spacing and pooling statutes, the thirteen common sources of supply underlying the 640 acre tract in the case at bar constitute thirteen separate and distinct spacing and drilling units where one bore hole can be used to test and develop one or all of the thirteen units.[3] Our statutes do not limit the number of separate spacing units that can be included in a pooling application or proceeding. However, whether a pooled owner is entitled to an election as to each common source of supply or each separate spacing unit as argued by appellant depends upon the facts and circumstances in each pooling proceeding.

The singular is used in our statutes when they speak to a pooling order, but this may not be construed to mean that in a pooling proceeding involving multiple common sources of supply or spacing units underlying the same tract that an owner is necessarily entitled to an election as to each separate unit. The pooling order should be responsive to the application and evidence. If the parties treat two or more spacing units underlying the same tract as a single unit, the pooling order may treat them as a single unit.[4] If the parties treat the different common sources of supply or spacing units as separate and distinct spacing units, and the evidence discloses an intent or desire on the owners' part that they be con-

sidered separately, an owner may not be required to have his rights under one spacing unit be dependent or contingent upon his rights or his election in another spacing unit. But the rights of all owners, including the owner seeking the pooling order, must be considered, because all orders requiring pooling "shall be [made] upon such terms and conditions as are just and reasonable and will afford to the owner of such tract in the unit the opportunity to recover or receive without unnecessary expense his just and fair share of the oil and gas." § 87.1(e), *supra.*

Appellee was authorized to include in his pooling application any or all of the thirteen spacing units, and he included all thirteen. Appellee proposed to drill a well to a sufficient depth to test the Hunton formation, and his evidence, in effect, treated the entire thirteen separate common sources of supply or thirteen spacing units as a single unit.

Appellants did not challenge appellee's application to pool although they did challenge the value of the leasehold estate and also proposed they be named the operator. Appellants wanted to test the Morrow, and whether they would later test the Hunton depended on the outcome of a well in another section and the structural position of the proposed well. Appellants said that if they were named the operator and after drilling to the Morrow they did not want to take the well on the Hunton, " . . . if any party wanted to take that well on the Hunton, they should have the option of taking over operation of the well." Appellants' evidence, in effect, treated the thirteen separate common sources of supply or spacing units as two units, *i. e.* one unit including

**3.** *Helmerich & Payne v. Corporation Commission,* Okl., 532 P.2d 419 (1975) involved 640 acre drilling and spacing units under nine governmental sections. Although there were seven common sources of supply under each of the nine sections, the manner in which the seven common sources of supply were pooled was not in issue.

**4.** As an example: In the case at bar there are thirteen common sources of supply or spacing

units underlying the same 640 acre tract. If the appellants and the appellee had wanted to drill and test only the Morrow Sand (or the Hunton), and the parties had treated all thirteen separate units as a single unit, a pooling order authorizing an election to participate in the proposed well or accept a single bonus for all the spacing units would have been proper. It appears that this is in harmony with the Commission's policy.

the Morrow Sand and all shallower formations, and another unit including all formations below the Morrow Sand.

■ Under the Commission's order, the Morrow Sand, and all formations above it, were, in effect, treated as one unit, and all formations below the Morrow were treated as another unit. This was responsive to the evidence. Appellants did not suggest they wanted to participate in the Morrow and accept bonuses for the shallower formation until after the pooling order was entered.

■ Appellants' argument that they were entitled to an election as to each common source of supply or each separate spacing unit may not be sustained. The parties did not treat the thirteen separate common sources of supply as separate units, but treated the Morrow Sand and all shallower formations as one unit, and the formations below the Morrow as another unit. The pooling order was responsive to the evidence.

We approve the pooling order in all respects except the participation formula, and the manner in which the Commission determined such formula. Appellants contend there is insufficient evidence to support the formula.

Appellee offered no evidence tending to demonstrate the proper approach in determining a formula to allocate the well costs. Appellants on the other hand, presented expert testimony as to the allocation of costs and recommended the approach suggested in Bulletin No. 2, Determinations of Values for Well Cost Adjustments, Joint Operations published by the Council of Petroleum Accountants Societies of North America. The Commission adopted the cost-participation formula heretofore set forth, and appellants contend that it is not supported by substantial evidence.

In reaching its conclusions concerning the cost formula, the Commission noted in its order:

". . . [I]n view of the possibility that certain owners will elect to drill only to the base of the Morrow Sand formation while other owners may elect to join

with Applicant in the drilling of the proposed unit well to a depth sufficient to test the Hunton Lime formation, it is necessary for the Commission to provide herein for allocation of well costs between the owners electing to join in a Morrow Sand test and the owners electing to join in a Hunton Lime test; that a witness testifying for a group of owners, some of which may elect to join in the proposed unit well only to the base of the Morrow Sand formation, recommended that well costs be allocated as suggested in Bulletin No. 2 of the Council of Petroleum Accountants Societies of North America [COPAS]; the Commission finds that the COPAS Bulletin No. 2 is recommended simply as a 'guide' for determination of values for well cost adjustments in joint operations and that the Commission has heretofore, in a variety of prior orders, adjusted well cost allocation on varying bases depending upon the operational facts of the particular case and the Commission takes judicial notice of its previous determinations for well cost allocations."

It is apparent the Commission did not base its participation formula upon any specific evidence in the case before it, but upon principles and evidence which it had followed in previous cases. Appellee defends this use of "judicial notice" by arguing that the Commission may take "judicial notice" of previous decisions. This abstract statement may be correct but how can it be applicable in the case at bar? To put the question more concretely by paraphrasing the language in *Ohio Bell Telephone Co. v. Public Utilities Commission of Ohio*, 301 U.S. 292, 57 S.Ct. 724, 81 L.Ed. 1093 (1937): How is it possible for this Court to review the law and facts and intelligently decide that the findings and conclusions of the Commission are supported by substantial evidence when the evidence upon which the findings and conclusions are based are not in the record and unknown?

In the *Ohio Bell* case, the Ohio Public Utilities Commission, in determining the value of Ohio Bell's property for rate mak-

ing purposes, modified the value established by Ohio Bell's evidence as of a certain date, by the percentage of decline or rise indicated during subsequent years by price trends of which the Commission took judicial notice. According to the Commission's findings, "The trend of land valuation was ascertained from the tax value in communities where 'Bell' had its largest real estate holdings." "For building trends resort was had to price indices of the Engineering News Record, a recognized magazine . . . Labor trends were developed from the same sources." Ohio Bell was not given an opportunity to explain or rebut the price trends which the Commission judicially noticed. The United States Supreme Court recognized that regulatory commissions have been vested with broad powers within the sphere of duty assigned them by law, and that even in quasi-judicial proceedings their informed and expert judgment exacts and receives a proper deference from courts when it has been reached with due submission to constitutional restraints, but it said "The fundamentals of a trial were denied . . . upon the strength of evidential facts not spread upon the record . . . This is not the fair hearing essential to due process."

In *Dayco Corporation v. Federal Trade Commission*, 362 F.2d 180 (6th Cir. 1966), the Commission found a manufacturer of automobile parts had violated certain federal laws by selling like products to different sellers at different prices and by entering into agreements to fix resale prices. On review, the Circuit Court held that F.T.C.'s use of official notice of another case as a substitute for proof in proceedings alleging the manufacturer of automobile parts, inter alia, was guilty of price fixing was a procedural impropriety requiring vacation of the order finding manufacturer guilty. The Circuit Court said: "However salutary the liberal use of official notice as an aid to the Federal Trade Commission and other administrative agencies in the dispatch of their business, due process must be observed in such use."

The annotation in 18 ALR2d 552 on "Administrative decisions or findings based on evidence secured outside of hearing," at page 555, states:

"As a general proposition, it is not proper for an administrative authority to base a decision of an adjudicatory nature, or findings in support thereof, upon evidence or information outside the record and in particular upon evidence obtained without the presence of and notice to the interested parties, and not made known to them prior to the decision."

In *Oklahoma Natural Gas v. Corporation Commission*, 90 Okl. 84, 216 P. 917 (1923), the Corporation Commission had determined, based upon its "independent knowledge", that the utility could obtain natural gas for a price approximately one-third less than the cost indicated by the evidence presented. This court said:

"The Commission should base its findings upon evidence before it. The rights of the parties depend upon facts established at the hearing, and not upon some independent knowledge of the Commission acquired after the hearing . . . A finding without evidence to support it is arbitrary and baseless."

Although the Administrative Procedures Act 75 O.S.1971, § 301 *et seq.*, as amended, is not applicable to the Corporation Commission, (§ 301), § 310(4) provides:

"Notice may be taken of judicially cognizable facts. In addition, notice may be taken of generally recognized technical or scientific facts within the agency's specialized knowledge. Parties shall be notified either before or during the hearing, or by reference in preliminary reports or otherwise, of the material noticed, including any staff memoranda or data, and they shall be afforded an opportunity to contest the material so noticed. The agency's experience, technical competence, and specialized knowledge may be utilized in the evaluation of the evidence."

The above statute expresses the minimum standards of state and federal due process. The Commission, taking judicial notice of "prior orders, adjusted well

cost allocation on varying bases depending upon the operational facts of the particular case," did not meet the minimum standards of due process, and that part of the order which relates to the participation formula is not supported by substantial evidence.

REVERSED.

LAVENDER, C. J., and WILLIAMS, HODGES, SIMMS, DOOLIN, HARGRAVE and OPALA, JJ., concur.

BARNES, J., dissents.