HARRY R. CARLILE TRUST, Zelda Arthurs, Trustee, Plaintiff-Appellee,

v.

COTTON PETROLEUM CORPORA-TION, a Corporation, Defendant-Appellant,

and

Oklahoma Corporation Commission, Intervenor-Appellant.

No. 61112.

Supreme Court of Oklahoma.

April 22, 1986.

As Corrected April 23, and May 5, 1986.

Rehearing Denied Feb. 3, 1987.

Gordon F. Brown, Scott D. Boughton, Brown and Lockhart, Oklahoma City, for appellant Cotton Petroleum Corp.

Gretchen Hoover, Deputy Gen. Counsel, Leslie Wilson Pepper, Asst. Gen. Counsel, Oklahoma City, for appellant Oklahoma Corp.

Cleeta John Rogers, Oklahoma City, for appellee.

OPALA, Justice.

This appeal presents for our decision four questions dealing with the standards of adequate notice for Corporation Commission spacing proceedings: [1] Is the Corporation Commission called upon to act in an adjudicative capacity when its statutory power is invoked to establish a drilling and spacing unit? [2] In Corporation Commission proceedings to establish a drilling and spacing unit, is notice to interested persons subject to the minimum standards of fairness exacted by the Due Process Clause? [3] Do the standards of due process, announced by this court in *Cravens v. Corporation Commission*,[1] govern when *non-producing mineral interests* alone are sought to be embraced within a spacing unit? [4] Should the teaching of *Cravens* be applied retroactively *to include only Carlile* (the victorious quiet-title plaintiff below), or purely prospectively to affect those spacing units comprised of non-producing leaseholds which will be formed by orders promulgated *after* the effective date of today's pronouncement? While we an-

1. Okl., 613 P.2d 442 [1980].

swer the first three questions in the affirmative, in response to the fourth question we hold that (a) today's pronouncement is to apply prospectively to spacing units which will be formed by Commission orders made *after* the effective date of this opinion, (b) *all* spacing orders made by the Commission prior to this opinion's effective date herein shall be left unaffected by the notice standards pronounced today, but (c) orders yet to be made in proceedings presently pending before the Commission and those in cases now on direct appeal, in which *areas under production* are sought to be, or were, comprised within a spacing unit, shall be regarded as governed by notice standards of *Cravens* and (d) the district courts may treat as *facially invalid* all agency spacing and drilling orders issued after the effective date of this opinion which do not comply with the notice standards pronounced herein.

In 1974 a party not involved in this lawsuit brought an application to the Corporation Commission [Commission] to create several 640-acre drilling and spacing units for gas and gas condensate produced from formations underlying various sections of land in Caddo County. The property here in contention was included within one of the new units to be formed. It consisted of a tract of land then owned in fee simple by the predecessors in title of the plaintiffs, Harry R. Carlile Trust by Zelda Arthurs, trustee [Carlile].

In compliance with the legislative requirements then in force [2] and pursuant to its own statute-implementing rule,[3] the Commission gave notice of hearing on the spacing application *solely* by publication in Oklahoma and Caddo counties. No other notice relative to the hearing was ever sent to, or received by, Carlile's predecessors in title. The Commission heard the application and issued its order creating a 640-acre drilling and spacing unit which included the Carlile tract. According to the record, no oil and gas was being produced from this section of land immediately before and at the time the Commission hearing was commenced.

In 1978 Carlile's predecessors in title [4] executed an oil-and-gas lease that was subsequently assigned to Cotton Petroleum Corporation [Cotton]. All bonus and delay rentals due under this lease were timely paid. Cotton commenced drilling operations on the unit created by the spacing order and completed the well within the primary term of the lease. Its location was *outside* the area included in the lease but *within* the spacing unit established by the 1974 order.

Some eight years after formation of the spacing unit, Carlile brought in 1982 this quiet-title suit against Cotton. The 1978 lease constituted the only interest Cotton claimed in the Carlile property and the sole cloud Carlile sought to remove from its title. By stipulation of the parties the complete record of the spacing proceedings was incorporated into the evidentiary material tendered with the motion for summary judgment. This record clearly confirms

---

2. The terms of 52 O.S.Supp.1982 § 87.1(a) provide in pertinent part:

"* * * When such a petition is filed with the Commission, *the Commission shall give at least fifteen (15) days' notice* of the hearing to be held upon such petition *by one publication,* at least fifteen (15) days prior to the hearing, in some newspaper of general circulation printed in Oklahoma City, Oklahoma, and *by one publication,* at least fifteen (15) days prior to the date of the hearing, in some newspaper printed *in the county,* or *in each county, if there be more than one,* in which the lands embraced within the application are situated...." [Emphasis supplied.]
This statute was later amended in 1984 and 1985 by changes not pertinent to the questions

addressed in this opinion. Okla.Sess.L.1984, Ch. 58 § 1 and Okla.Sess.L.1985, Ch. 141 § 2.

3. Rule 12(b), Oklahoma Corporation Commission General Rules of Procedure, provides:

"*Oil and Gas Conservation:* Notice of an application or complaint relating to conservation of oil and gas shall be published one time at least fifteen (15) days prior to the hearing in a newspaper of general circulation published in Oklahoma City, Oklahoma and in a newspaper published in each county in which lands embraced in the application are located. (52 O.S.Supp.1980, § 87.1, 52 O.S.1971, §§ 97 and 287.1 et seq.) (8–15–81)"

4. Harry R. Carlile and Zelda Carlile were shown as lessors on the 1978 lease.

that the Commission attempted *no* service other than by publication. Because no actual notice had been given to its predecessors in title, Carlile claimed the 1974 order was facially invalid. Based on the due process notice standards announced in *Cravens*, [5] the trial court declared that, because publication notice alone was insufficient to invest the Commission with adjudicative cognizance, the 1974 spacing order was facially ineffective. After Carlile had recovered summary judgment, Cotton appealed and Carlile moved here for an order requiring Cotton to post an undertaking in the form of a "supersedeas bond." The motion met with this court's adverse disposition.[6]

## I

## THE DISTRICT COURT MAY WITH-HOLD LEGAL RECOGNITION FROM A COMMISSION ORDER THAT IS FACIALLY INVALID

■ By its collateral attack Carlile attempted to avoid the legal effect of the 1974 spacing order. A collateral attack may not be launched on a Commission order that is facially invulnerable.[7] The district court's power to inquire into the validity of Commission orders is legally limited to ascertaining, from an inspection of the face of the proceedings,[8] if the Commission had jurisdiction to issue the order.[9] A

Commission order is deemed facially invalid *only* when the face of the record reveals the absence of *at least one* of these three requisite elements of agency jurisdiction— i.e., (1) jurisdiction over the parties, (2) jurisdiction over the subject matter, or (3) jurisdictional power to issue the specific order in question.[10]

## II

## THE STATUTORY AUTHORITY OF THE COMMISSION TO ESTABLISH DRILLING AND SPACING UNITS IS ADJUDICATIVE IN NATURE AND IT IS SUBJECT TO FEDERAL AND STATE STANDARDS OF DUE PROCESS GOVERNING THE ADEQUACY OF NOTICE TO CONFER JUDICIAL JURISDICTION

■ The applicability of due process standards of notice to proceedings for the formation of drilling and spacing units turns on whether the Commission's authority to space calls for an exercise of its *adjudicative* or *rulemaking* function. An agency's authority to make rules is clearly distinguishable from that of adjudication. *Rulemaking* includes the power to adopt *rules* and regulations of general application—both substantive and procedural— which are legislative in nature, operate prospectively and have general application.[11]

5. See footnote 1 *supra.*

6. In its order denying Carlile's motion to set "supersedeas bond" this court held that: (1) Cotton may not be compelled to suspend the effectiveness of the cancellation decree under review. *State ex rel. Mose v. District Court of Marshall County,* 46 Okl. 654, 149 P. 240 [1915]; *McClain v. Starr,* 50 Okl. 738, 150 P. 666 [1915] and *Nicholson v. State,* 132 Okl. 298, 270 P. 567 [1928], (2) the trial court's decree is not subject to supersedeas, 12 O.S. 1981 § 968 and *Wilks v. Wilks,* Okl., 632 P.2d 759 [1981], and (3) Carlile is free to invoke judicial process for carrying the trial court's decree into effect and to avail itself of the remedies prescribed by law for the enforcement and satisfaction of its judgment.

7. Art. 9 § 20, Okl.Const. and 52 O.S.1981 § 111. Section 111 provides in pertinent part:
   "No collateral attack shall be allowed upon orders, rules and regulations of the Commission...."

8. The district court's inquiry into the presence of the requisite jurisdictional elements was confined to an inspection of the proceedings; i.e., the application, the process by which the parties were notified and the Commission's order.

9. *McDaniel v. Moyer,* Okl., 662 P.2d 309, 312 [1983]; *Chancellor v. Tenneco Oil Company,* Okl., 653 P.2d 204, 206 [1982]; *Gulfstream Petroleum Corp. v. Layden,* Okl., 632 P.2d 376, 379 [1981]; *Woods Petroleum Corp. v. Sledge,* Okl., 632 P.2d 393, 396 [1981] and *State v. Corporation Com'n,* Okl., 590 P.2d 674, 677 [1979].

10. *Gulfstream Petroleum Corp. v. Layden, supra* note 9 at 379.

11. *State ex rel. Villines v. Freeman,* Okl., 370 P.2d 307, 310 [1962]. In *State ex rel. G.T. Blankenship v. Freeman,* Okl., 440 P.2d 744, 747 [1968] (syllabus 10) legislative facts were distinguished from adjudicative facts in these words:

*Orders* of an administrative body are *adjudicative* in character. They apply to named persons or specific situations and have immediate rather than future operation.[12]

The Commission acts in a legislative capacity when it exercises its rulemaking powers to prevent waste and to protect correlative rights, but not when it attempts to apply these rules. The application of rules to the facts found constitutes an exercise of an adjudicative function.[13] When acting in its legislative capacity, the Commission may always amend its rules and regulations to prevent waste and to protect rights of mineral owners.[14] But because orders are adjudicative in character, they may not be amended absent a showing of changed conditions.[15] The same adjudication/rulemaking dichotomy governs the process of determining whether, under the Administrative Procedures Act [APA],[16] an act of the Commission constitutes *a rule* subject to the Act's requirement or *an order* which is free from those requirements. While the Commission is not generally subject to the provisions of the APA—except the section which mandates that state agencies with rulemaking powers file copies of their rules and regulations[17]—settled law follows the APA standards by excluding from the requirement of filing *all* those Commission *actions* that are truly adjudicative in character.[18]

Three distinct legal issues and consequences are implicated in a proceeding to establish spacing units: (1) an area of the common source of supply must be determined and its boundaries identified; (2) royalties within the established unit stand pooled as a result of the unit's formation; and (3) a restriction on the freedom to drill must be imposed.[19] Because spacing clearly calls for a factual finding and affects the proprietary incidents of the mineral estate of every owner sought to be brought within the new unit, we conclude that a quest for the formation of a drilling and spacing unit calls for *adjudication* rather than *rulemaking.*

When the Commission acts in an adjudicative capacity it functions much like a court. The general norms of law which govern the quality of notice that must be given in proceedings conducted by judicial tribunals apply with like force and effect to the Commission.[20] The minimum norms of federal and state due process hence must

"Facts to which the law is to be applied in the process of adjudication are called adjudicative facts; these are facts 'about the parties' and must be ascertained from formal proof, as distinguished from 'legislative facts' which are general and may be judicially noticed from legislative source materials for the purpose of determining the meaning, effect, content or validity of enactments."

12. *State ex rel. Villines v. Freeman, supra* note 11 at 310 and *State ex rel. G.T. Blankenship v. Freeman, supra* note 11 at 747.

13. *H.F. Wilcox Oil & Gas Co. v. State,* 162 Okl. 89, 19 P.2d 347, 348 [1933]; *Halpin v. Corporation Commission,* Okl., 575 P.2d 109, 111 [1978] and *May Petroleum v. Corp. Com'n of State of Okl.,* Okl., 663 P.2d 716, 717 [1983].

14. 52 O.S.1981 § 86.4 (rules governing common sources of supply), § 97 (jurisdiction to make rules and regulations), § 243 (prevention of waste of natural gas) and § 273 (prevention of waste of crude oil).

15. *Cameron v. Corporation Commission,* Okl., 414 P.2d 266, 271 [1966] and *Phillips Petroleum Co. v. Corporation Commission,* Okl., 482 P.2d 607, 609–610 [1971].

16. 75 O.S.1981 §§ 301 et seq.

17. 75 O.S.1981 § 304 and *C.F. Braun & Co. v. Corporation Commission,* Okl., 609 P.2d 1268, 1273 [1980].

18. *State ex rel. Villines v. Freeman, supra* note 11 at 310 and *Cameron v. Corporation Commission, supra* note 15 at 271.

19. 52 O.S.Supp.1982 § 87.1 and 52 O.S.1981 §§ 287.1 et seq. A spacing order creates the unit, pools royalty interests within the unit, directs that only one well be drilled in the unit within a specific location and prohibits the drilling of a well at another location or operating a well drilled in violation of the spacing order. *Gulfstream Petroleum Corp. v. Layden, supra* note 9 at 379.

20. *Monson v. State ex rel. Oklahoma Corporation Commission,* Okl., 673 P.2d 839, 841–842 [1983].

govern the standards of notice to be given in spacing proceedings.[21]

## III

### THE *CRAVENS* STANDARDS OF NOTICE MUST GOVERN IN PROCEEDINGS FOR FORMATION OF A DRILLING AND SPACING UNIT TO BE COMPRISED OF NON-PRODUCING LEASEHOLDS

■ Because significant property interests are affected when the formation of a drilling and spacing unit is sought, interest owners are constitutionally entitled to notice which is reasonably calculated to apprise them of proceedings to be conducted.

■ The statutory norm presently in force provides that the Commission give notice of its spacing proceedings *solely by publication.*[22] In *Cravens*[23] we held that this statutorily-prescribed notice form is inadequate—vis-a-vis holders of *producing mineral interests* whose identities were known or could have been ascertained with due diligence—to meet the minimum due process standards laid down in *Bomford v. Socony Mobil Oil Co.*[24] and *Mullane v. Central Hanover Bank & Trust Co.*[25] No less than these notice standards—later implemented by Rule 16[26]—is exacted by the fundamental law's shield of protection in proceedings to establish spacing units which are to embrace *only non-producing*

21. *C.F. Braun & Co. v. Corporation Commission, supra* note 17 at 1273; *Wolfenbarger v. Hennessee,* Okl., 520 P.2d 809, 811–812 [1974].

22. See *supra* note 2 for the text of 52 O.S.Supp. 1982 § 87.1(a). *The statutory notice requirement differs* when mineral interests are sought to be pooled. *The pooling applicant has the duty to give notice by publication and by mail to those owners of mineral interests whose addresses are known or could be ascertained through the exercise of due diligence.* 52 O.S.Supp.1982 § 87.-1(e). All these notice requirements were left unchanged by the 1984 amendment. Okl.Sess. L.1984, Ch. 58 § 1.

23. In *Cravens v. Corporation Commission, supra* note 1, the mineral lessees sought to establish, upon publication notice only, a 160-acre drilling and spacing unit which was to consist of their own *non-producing* 80 acres and of another 80-acre tract with a *producing* gas well.

24. Okl., 440 P.2d 713, 718 [1968]. In *Bomford* the court said that before a plaintiff may resort to the publication process he must make a diligent search of all available resources. The court indicated that due diligence requires at least a search of local tax rolls, deed records, judicial and other official records, telephone directories, city directories and the like.

25. 339 U.S. 306, 318–320, 70 S.Ct. 652, 659–660, 94 L.Ed. 865, 875–876 [1950]. When a proceeding is likely to affect constitutionally protected property interests, notice to interested parties must be "reasonably calculated, under all circumstances" to apprise them of the pendency of the action and afford them an opportunity timely to interpose their objections. Id., 339 U.S. at 314, 70 S.Ct. at 657. Notice is a fundamental element of due process as well as a jurisdictional requirement. *Union Texas Petroleum, a Division of Allied Chemical Corporation v. Corpora-*

tion Commission of State of Oklahoma, Okl., 651 P.2d 652, 658 [1982], *cert. denied,* 459 U.S. 837, 103 S.Ct. 82, 74 L.Ed.2d 78 [1982] and *Cate v. Archon Oil Co., Inc., infra* note 29 at 1356; see also *Application of Tubbs,* Okl., 620 P.2d 384, 385 and 388 [1980]. Before jurisdiction may be exercised over a person in proceedings that may directly and adversely affect his legally protected interests, the minimum standards of due process require notice that is calculated to provide knowledge of the proposed exercise of jurisdiction and an opportunity to be heard. *Union Texas Petroleum, supra, Cravens, supra* note 1 and *Application of Tubbs, supra.* The right to a hearing is of little value unless adequate notice is given.

> Our due process clause in Art. 2 § 7, Okl. Const., has a definitional sweep that is coextensive with its federal counterpart. *McKeever Drilling Co. v. Egbert,* 170 Okl. 259, 40 P.2d 32, 36 [1935] and *Matter of Rich,* Okl., 604 P.2d 1248, 1251 [1979]. The latter, and hence our own, requires that legal process affecting property conform to the measure of fairness which accords with the minimum standards of due process.

26. Rule 16, Rules for District Courts, 12 O.S. 1981, Ch. 2, App., provides the procedural measures that must be followed before a judgment may be taken against a defendant served solely by publication. A trial tribunal must conduct an inquiry to determine whether the plaintiff made a diligent search of all reasonably available sources when a default judgment is sought. After hearing the evidence, if the judge finds that the plaintiff did in fact exercise due diligence in conducting a meaningful search, a standard recitation to that effect is to be included in the journal entry of judgment. See *Johnson v. McDaniel,* Okl., 569 P.2d 977, 980–981 [1977]. The statutory counterpart of Rule 16 is found at 12 O.S.Supp.1984 § 2004(C)(3)(e).

*mineral interests.* Notice in these latter proceedings must not only comply with the statutory standards but also provide affected persons whose whereabouts are known or ascertainable with *knowledge* of the pending proceeding.

Publication notice is not reasonably calculated to provide actual knowledge of instituted proceedings. It is hence inadequate as a method to inform those who could be notified by more effective means such as personal service or mailed notice.[27] Mail service is an inexpensive and far more efficient mechanism to enhance the reliability of notice than either publication or posting.[28] When a party's name and address are reasonably ascertainable from sources available at hand, communication by mail or other means certain to insure actual notice is deemed to be *a constitutional prerequisite in every proceeding which affects either a person's liberty or property interests.*[29]

■ Because resort to publication service is constitutionally permissible *only* when all other means of giving notice are unavailable, we hold today that the face of an administrative proceeding must affirmatively show a diligent but unsuccessful effort to reach the affected party by better process.[30] *In short, courts may not presume publication service alone to be constitutionally valid when the judgment roll or record of an administrative proceeding fails to show that the means of imparting better notice were diligently pursued but proved unavailable.*

**27.** *Application of Tubbs, supra* note 25 at 385 and 388.

**28.** *Greene v. Lindsey,* 456 U.S. 444, 455, 102 S.Ct. 1874, 1880, 72 L.Ed.2d 249, 258–259 [1982]. In *Greene,* the Court held that posting a summons on the door of a tenant's apartment was an inadequate means of providing notice of forcible entry and detainer. See also *The Postman Never Rings Twice: The Constitutionality of Service of Process by Posting After Greene v. Lindsey,* The American University L.Rev. 601–641 [1984].

**29.** *Mennonite Board of Missions v. Adams,* 462 U.S. 791, 103 S.Ct. 2706, 2711–2712, 77 L.Ed.2d 180 [1983]. The Court held in *Mennonite* that a mortgagee's knowledge of delinquency in payment of taxes was not the equivalent of notice that a tax sale was pending and that posting and publishing notice of the tax sale and mailing notice to the mortgagor by certified mail did not meet the due process standards of notice. The Court said that a party's ability to take steps to safeguard its interests does not relieve the state of its constitutional obligation to give mailed notice. *Mennonite* represents a major extension of the *Mullane* rationale, *supra* note 25, not only because it involves a direct application of *Mullane* to tax sale proceedings, but also because the Court imposed a requirement on a state to notify landowners, mortgagees, and "those with a legally protected property interest." See *Mennonite Board of Missions v. Adams: Insufficient Notice Under the New York In Rem Statutes,* 33 Buffalo L.Rev. 389–415 [1984]. See also *Cate v. Archon Oil Co., Inc., infra* note 42 at 1356. In *Continental Insurance Co. v. Moseley,* 98 Nev. 476, 653 P.2d 158 [1982], *vacated,* 463

U.S. 1202, 103 S.Ct. 3530, 77 L.Ed.2d 1383 [1983], *on remand,* 683 P.2d 20 [Nev.1984], the *Mennonite* notice standards were applied to a probate case where an identified creditor, whose whereabouts were known, had been notified solely by publication. *Continental* reaffirms the constitutional teaching that publication notice is but *a last resort device* which may be used *only* when it is impossible to ascertain, from available sources at hand, either the identity or the whereabouts of persons who will be adversely affected by the outcome of a judicial proceeding.

**30.** At a minimum, well spacing procedures should include (a) the filing by Commission officials of an affidavit for publication service which reflects the identity of the parties whose whereabouts are unknown for service of process and cannot be ascertained with due diligence, (b) an adjudicative inquiry by the Commission into the sufficiency of the search to ascertain the whereabouts of parties served solely by publication and (c) a recitation in the Commission well spacing order that [1] upon an examination of the record and proof of publication, the Commission found the process to be proper and [2] upon an adjudicative inquiry into the factual issue of due diligence, the Commission found that its officials conducted a meaningful search of all reasonably available sources at hand to ascertain the whereabouts of those entitled to notice but who were served solely by publication.

*A like procedure should be followed in a pooling application. In those proceedings the burden of notice-giving falls on the applicant rather than on the Commission.* See footnote 22 *supra.*

## IV

### THE STANDARDS OF NOTICE PRONOUNCED TODAY SHALL APPLY ONLY TO SPACING UNITS THAT WILL BE FORMED BY ORDERS MADE AFTER THE EFFECTIVE DATE OF THIS OPINION

We must next determine whether (a) our pronouncement today should be given full retroactive effect, and if not, (b) the new rule should be allowed a purely prospective application or (c) its retroactivity should be limited to the case at hand.

### A

### RETROACTIVITY OF THE NEW RULE VIS-A-VIS SPACING UNITS FORMED BY ORDERS MADE BEFORE THE EFFECTIVE DATE OF TODAY'S PRONOUNCEMENT

■ The United States Constitution neither prohibits nor requires that a judicial decision have retrospective operation.[31] Retroactivity is the common-law's traditional approach to implementing decisions that overrule prior case law. Judicial policy determines whether, and to what extent, a new rule will operate retroactively.[32] In *Thompson v. Presbyterian Hospital, Inc.*,[33] the court addressed the standards to be used in withholding retroactivity when a new constitutional rule is pronounced. There, we used the tripartite test of *Linkletter v. Walker*.[34] It calls for consideration of three factors: (1) the purpose of the new rule; (2) the extent of reliance on the old doctrine; and (3) the burden likely to be imposed on the administration of legal process by the increased volume of curative juridical action.

*Cravens* precludes an exercise of adjudicative powers by an administrative agency over persons whose interests in production may be directly and adversely affected unless a diligent effort has been made to give timely personal notice which is reasonably calculated to inform them of an instituted proceeding. Our pronouncement here extends the *Cravens* notice standards to spacing proceedings affecting non-producing leaseholds. More significantly, today's opinion holds that those Commission orders which fail to show on the face of the proceedings a diligent effort to give a better notice than by publication are facially defective. The new norms pronounced by us here represent *a clear break* with a contrary statutory policy of *long standing*. Spacing order applicants of yore could have justifiably relied on the validity of the legislatively-prescribed procedural norms followed by the Commission and sanctioned by enactments which have been continuously in force for several decades.

Were we to pronounce today that *Cravens* had retroactive effect on *all* previous orders that established spacing units, whether comprised of non-producing or producing leaseholds, our holding would have an adverse impact on the administration of the Commission's adjudication process. It would result in blanket invalidation of countless proceedings. All drilling and spacing orders made under the existing statutory provisions would at once fall as

---

**31.** *Great Northern Ry. Co. v. Sunburst Oil & Refining Co.*, 287 U.S. 358, 364–365, 53 S.Ct. 145, 148, 77 L.Ed. 360 [1932]; *Linkletter v. Walker, infra* note 34, 381 U.S. at 628–629, 85 S.Ct. at 1737 and *Chevron Oil Co. v. Huson, infra* note 34, 404 U.S. at 106–107, 92 S.Ct. at 355.

**32.** *Thompson v. Presbyterian Hospital, Inc.*, Okl., 652 P.2d 260, 268 [1982] and *Griggs v. State ex rel. Okl. Dept. of Transp.*, Okl., 702 P.2d 1017, 1020 [1985].

**33.** Okl., 652 P.2d at 268, *supra* note 32.

**34.** 381 U.S. 618, 629, 85 S.Ct. 1731, 1738, 14 L.Ed.2d 601 [1965].

In *Chevron Oil Co. v. Huson*, 404 U.S. 97, 106–107, 92 S.Ct. 349, 355, 30 L.Ed.2d 296 [1971], the Court held that federal courts must consider three factors when deciding whether to give retroactive or prospective effect to a new rule in a federal civil case: (a) whether a new rule establishes a new principle of law not clearly foreshadowed; (b) whether retroactive application will advance or retard operation of the new rule; and (c) whether non-retroactive application is necessary to avoid injustice or hardship. Today's pronouncement is consistent with the current jurisprudence of the U.S. Supreme Court.

void. A multitude of drilling and spacing units in Oklahoma would no doubt be affected. Oil-and-gas leases held by production from wells located within the unit but outside the demised premises would be threatened with cancellation. In short, a pronouncement with full retrospective scope would doubtless have a destablilizing effect on industry-wide activities.[35]

## B

## THE NEW RULE SHOULD BE GIVEN PROSPECTIVE APPLICATION

■ The extent of reliance on the old doctrine has a lengthy history as a factor supportive of prospective application for a new rule.[36] The inquiry, when considering the reliance factor, is often phrased in terms of whether the new law-changing decision overrules "clear past precedent" or addresses an issue of first impression whose resolution was not "clearly fore-shadowed."[37] The resolution of the constitutional issue reached in this case was not clearly foreshadowed either by *Bomford*[38] or by the much later pronouncement in *Cravens. Bomford*, which addressed itself to the procedure to be followed before *judicial jurisdiction*[39] may be exercised against one served solely by publication, left *agency practice* unaffected by its teachings. Unlike this case, *Cravens* dealt *narrowly* and on *direct review* with the effect of publication notice in a proceeding in which an *area under production* was sought to be incorporated in a spacing unit to be formed with non-producing leaseholds. *Cravens* did not explicitly decide whether its effect was limited to the successful litigant therein or would have a fully retroactive sweep. Another signal distinction to notice is that *Cravens* was a *direct appeal* in which we pronounced notice by publication inadequate but left unsettled the issue precisely before us here,

35. *Cravens, supra* note 1, unlike this case, was a *direct appeal* from the Commission. It dealt with a claim to an election after the time limit set in the pooling order because of failure to receive timely notice. There we did not discuss, but left unsettled, the effective reach of that decision. The instant case is a *collateral attack* on the Commission's spacing order. Its retroactive application would have far reaching consequences on oil-and-gas leaseholds throughout the state. Significant hardships would be imposed and settled property interests would be upset by a retroactive imposition of the new requirement. See *Cipriano v. City of Houma*, 395 U.S. 701, 706, 89 S.Ct. 1897, 1900, 23 L.Ed. 647 [1969].

36. See Note, Prospective Overruling and Retroactive Application in Federal Courts, 71 Yale L.J. 907, 944–950 [1962] and cases cited therein. A purely prospective decision has been criticized as an advisory opinion which violates the case-or-controversy requirement in Article III of the U.S. Constitution. See, Note, Prospective Overruling and Retroactive Application in the Federal Courts, *supra* at 930–933. Supporters of pure prospectivity believe that a court does decide a case or controversy even when it applies the new rule in a purely prospective manner. The court can decide the controversy based on the old rule of law and, at the same time, pronounce a new rule of law to be applied in the future to a like case. See Beytagh, Ten Years of Non-Retroactivity: A Critique and a Proposal, 61 Va.L.Rev. 1557, 1603–1604 [1975]; Currier, Time and

Change in Judge-Made Law: Prospective Overruling, 51 Va.L.Rev. 201, 216–234 [1965] and Mullamud, Prospective Limitation and the Rights of the Accused, 56 Iowa L.Rev. 321, 333–334 [1970].

Opponents of pure prospectivity argue that, because no benefit will be derived from the advocacy of a new rule, most litigants will have no reason for persuading a court to change its position. Although pure prospectivity often deters those who most need relief and will perpetuate an outmoded legal doctrine, it is at times an essential device for a painless ushering in of a sharply different norm of law. *Cipriano v. City of Houma, supra* note 35. See *Mullamud, supra* at 335, and Mishkin, The Supreme Court, 1964 Term-Forward: The High Court, The Great Writ, and the Due Process of Time and Law, 79 Harv.L.Rev. 56, [1965].

37. *Chevron Oil Co. v. Huson, supra* note 34.

38. See *supra* note 24.

39. *Bomford, supra* note 24 at 718. See *supra* note 26 in which reference is made to Rule 16, Rules for District Courts, 12 O.S.1981, Ch. 2, App. See also Restatement (2d) Conflict of Laws §§ 24 et seq. [1971]. "Judicial Jurisdiction" in the Restatement is limited to the exercise of judicial jurisdiction by a state through its courts. Id. at § 24, comment (d), p. 107. In *Bomford* only "judicial jurisdiction" was implicated.

i.e., whether the Commission spacing order in a *collateral attack* is facially invalid when it is not apparent on the face of an administrative proceeding that the person or entity charged with notice-giving exercised a diligent effort to give personal notice to the affected parties.

This case is different from *Snethen v. Okl. State Union of the Farmers Ed. & Co-op. U.,*[40] *Unah By and Through Unah v. Martin,*[41] *Cate v. Archon Oil Co., Inc.,*[42] *Vanderpool v. State,*[43] *Cravens*[44] and *State ex rel. Cartwright v. Dunbar,*[45] in all of which the winning party received the fruits of its victory. The cited cases were reached on *direct appeal;* this one comes

in the posture of a *collateral attack.* The distinction we make here between direct appeals and collateral challenges finds ample support in federal jurisprudence.[46] The U.S. Supreme Court has given purely prospective application to new constitutional rules in collateral attacks upon state criminal convictions, resting its decisions upon the consideration of finality in the judicial process. In most instances, the interest in reducing a controversy to a final judgment outweighs the competing interest of readjudicating settled judgments according to legal standards in effect when a collateral attack is made. Society has an interest in the finality of decisions rendered under ac-

**40.** Okl., 664 P.2d 377, 382 [1983], 38 ALR4th 531.

**41.** Okl., 676 P.2d 1366, 1370 [1984].

**42.** Okl., 695 P.2d 1352, 1356 [1985].

**43.** Okl., 672 P.2d 1153, 1157 [1983].

**44.** See *supra* note 1.

**45.** Okl., 618 P.2d 900, 909, 914 [1980].

**46.** (a) In *Linkletter v. Walker, supra* note 34, 381 U.S. at 636–640, 85 S.Ct. at 1741–1743, the Court addressed the issue of whether *Mapp v. Ohio,* 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 [1961] was to be applied retroactively or prospectively. The Court—despite giving the defendant in *Mapp* the benefit of the new constitutional ruling—refused to extend the privilege of the exclusionary rule to the defendant in *Linkletter.* The Court distinguished between cases on direct appeal which received the benefit of the new rule and cases like *Linkletter* which sought collateral review. The Court held that "the effect of the subsequent ruling of invalidity on prior final judgments when collaterally attacked is subject to no set 'principle of retrospective invalidity.' ..." Id., 381 U.S. at 627, 85 S.Ct. at 1736. The Court felt that the purpose of the exclusionary rule would not be furthered by applying it to cases already finalized.

(b) In *Solem v. Stumes,* 465 U.S. 638, 104 S.Ct. 1338, 79 L.Ed.2d 579 [1984] and *Shea v. Louisiana,* 470 U.S. 51, 105 S.Ct. 1065, 1069–1070, 84 L.Ed.2d 38 [1985] the issue before the Court was whether the rule in *Edwards v. Arizona,* 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 [1981] should be applied retroactively. Under the *Edwards* rule a criminal defendant's Fifth and Fourteenth Amendment rights are violated when his confession—obtained by a police-instigated interrogation

when defendant's requested counsel was not present—is used.

In *Solem, supra,* 104 S.Ct. at 1345–1346—a federal collateral attack upon a state conviction that had become final—the Court held that the rule announced in *Edwards, supra,* should not be applied retroactively. A key factor under *Solem* is the extent of the reliance by law enforcement authorities on the old standards. 465 U.S. at 643, 104 S.Ct. at 1341. In *Shea, supra,* 105 S.Ct. at 1070, the *Edwards* rule was held to apply retroactively to all cases in which the process of *direct appeal* had not yet been completed when *Edwards* was decided. The Court created a distinction between retroactivity on direct review of a conviction and on collateral attack of a conviction that has become final.

(c) Justice Harlan was of the view that new constitutional rules should be made retroactive to pending criminal cases but saw an obvious difference when the plea before the Court was for retroactivity in a collateral attack. See *Mackey v. United States,* 401 U.S. 667, 675–679, 91 S.Ct. 1160, 1171–1173, 28 L.Ed.2d 404 [1971] (Harlan, J., concurring). There he pointed out that in civil cases the overriding interest of society in finality made collateral attacks on final judgments almost unthinkable. He noted, "[t]his is not to suggest that civil and criminal collateral attack ought necessarily to be precisely congruent in the federal system. But certainly it illustrates that the law has always perceived collateral attack as a problem quite different from direct appeal." Id., 401 U.S. at 683, 91 S.Ct. at 1175. See *Shea v. Louisiana, supra,* 105 S.Ct. at 1070, note 4.

(d) Recent use of limited retroactivity demonstrates its application is confined to those civil disputes over the constitutionality of a state statute in which the challenge is made by direct rather than collateral attack. See *Kirchberg v. Feenstra,* 450 U.S. 455, 462–463, 101 S.Ct. 1195, 1200, 67 L.Ed.2d 428 [1981].

cepted judicial standards and in the conservation of judicial time and expense. This method of adjudication insures stability in the judicial system. Cases in which parties seek the benefit of new rules by a collateral challenge are more likely to impose a greater hardship on the administration of legal process. Evidence and records in old cases may deteriorate or become lost.

Other considerations also provide clear support for a purely prospective application in this case. The *new* constitutional rule announced today does not operate here to condemn a prior course of conduct pursued by a private party-litigant. Rather, it corrects a defective agency process of long standing which had received extended and certain statutory sanction. The constitutionally infirm spacing order in contention here was not *procured* nor *caused to be procured* by the lessee or *anyone* in privity with it. Rather, the offending order was on file at the agency and its *existence,* at least constructively, was known and *accepted* by all the parties when Carlile's *predecessor* in title executed the mineral

*lease in dispute* and, by its terms, the lease was *expressly* made *subject to* all existing "administrative regulations." [47]

The objective of giving a new rule purely prospective application is to protect the public's reasonable expectations of reliance on prior judicial decisions. Because there is here ample reason for avoiding the significant hardships that would be imposed if this decision were given retroactive effect,[48] we hold that (a) today's pronouncement is to apply prospectively to spacing units which will be formed by Commission orders *after* the effective date of this opinion, (b) *all* spacing orders made by the Commission prior to the effective date of this opinion shall be left unaffected by the notice standards pronounced today, but (c) orders yet to be made in proceedings presently pending before the Commission and in cases now on direct appeal, in which *areas under production* are sought to be, or were, comprised within a spacing unit, shall be regarded as governed by notice standards announced in *Cravens.*[49]

47. The lease terms provide in pertinent part: "* * * All express or implied covenants of this lease shall be subject to all Federal and State Laws, Executive Orders, Rules and Regulations, and this lease shall not be terminated in whole or in part, nor lessee held liable in damages, for failure to comply therewith, if compliance is prevented by, or such failure is the result of any such Law, Order, Rule or Regulation. * * *"

48. In *Cipriano v. City of Houma, supra* note 35, 395 U.S. at 706, 89 S.Ct. at 1900, the Court held violative of the Equal Protection Clause a state law which gave only property taxpayers the right to vote in elections to approve issuance of revenue bonds by a municipal utility. The Court—holding that the new rule would not be given full retroactive effect—emphasized that "significant hardships" would be imposed on "cities, bondholders, and others connected with municipal utilities" if the decision were given full retroactive effect. The Court noted that where its decision might produce substantial inequitable results if applied retroactively, there was ample precedent for avoiding "injustice or hardship" by a purely prospective holding.
  A new rule affecting civil procedure was also given a purely prospective application in *England v. Louisiana State Board of Medical Examiners,* 375 U.S. 411, 84 S.Ct. 461, 468, 11 L.Ed.2d 440 [1964]. The Court held that the parties had a mistaken view as to the meaning

of one of its earlier decisions but that, in the face of support given their view by the lower court and commentators, the parties were acting reasonably in relying upon their misguided view of the law.
  In *Wainwright v. Stone,* 414 U.S. 21, 94 S.Ct. 190, 38 L.Ed.2d 179 [1973], the Court reiterated its commitment to *Great Northern R. Co. v. Sunburst Oil & Refining Co.,* 287 U.S. 358, 364, 53 S.Ct. 145, 148, 77 L.Ed. 360 [1932], expressing it in the following language: "'A state in defining the limits of adherence to precedent may make a choice for itself between the principle of forward operation and that of relation backward. It may say that decisions of its highest court, though later overruled, are law none the less for intermediate transactions.'"

49. We are not extending retroactivity to collateral attacks; saved by today's opinion for application of the *Cravens* notice standards are cases pending in the trial or appellate process in which a direct challenge may be made to a spacing order embracing *areas under production.* See *Hankerson v. North Carolina,* 432 U.S. 233, 97 S.Ct. 2339, 53 L.Ed.2d 306 [1977] and Corr, Retroactivity: A Study In Supreme Court Doctrine "As Applied," 61 N.Carol.L.Rev. 745, 751–752 [1983].

Moreover, were Carlile *alone* allowed to harvest the fruits of today's victory, a *mixed efficacy status* would be impressed upon the drilling and spacing unit here in contest. Because of its apparent constitutional defect, the Commission order under challenge before us would fall as void *only* insofar as it affects a single interest—the oil-and-gas leasehold in this litigation. The spacing regime established by this clouded order would nonetheless remain invulnerable to attack *against every other lessee within the same unit*, even one with an interest as infirm as that of Cotton.

Providing Carlile with a tangible benefit from its forensic triumph would clearly harm both the symmetry and stability of rights in property settled under the existing rules.[50] Sound policy militates against cloaking today's decision with retroactivity limited to Carlile's leasehold. The course to be chosen is that which will avoid hardship to *all* persons who had acted in mistaken reliance on the validity of a long-followed, statutorily-sanctioned rule of procedure.[51]

The trial court's decree of lease cancellation is accordingly reversed; the new standards pronounced today for a constitutionally adequate notice to persons interested in, or affected by, Commission proceedings to establish drilling and spacing units shall operate prospectively to spacing units that will be formed by Commission orders *after* the effective date of this opinion; *all* spacing orders made by the Commission *prior*

to the effective date of this opinion shall be left unaffected by the notice standards pronounced today; but orders yet to be made in proceedings presently pending before the Commission and in cases now on direct appeal, in which *areas under production* are sought to be, or were, comprised within a spacing unit, shall be regarded as governed by notice standards announced in *Cravens;* the district courts may henceforth treat as facially invalid all agency orders issued after the effective date of this opinion, unless they comply with the notice standards pronounced herein; mandate shall issue herein ten days after the court's disposition of rehearing, but if no rehearing be sought, then thirty days after this opinion has been promulgated.

JUDGMENT REVERSED.

SIMMS, C.J., and HODGES, LAVENDER and HARGRAVE, JJ., concur.

KAUGER and SUMMERS, JJ., concur in part and dissent in part.

WILSON, J., dissents.

KAUGER, Justice, with whom, SUMMERS, Justice, join, dissenting *only* to the completely prospective application of the opinion.

Neither the United States Constitution nor the Constitution of the State of Okla-

**50.** *Bomford v. Socony Mobil Oil Co., supra* note 24 at 718.

**51.** *Cipriano v. City of Houma, supra* note 35, 395 U.S. at 706, 89 S.Ct. at 1900. For Oklahoma cases that used the purely-prospective-operation approach in announcing a new rule, see *Harness v. Myers,* 143 Okl. 147, 288 P. 285, 289–290 [1930]; *Oklahoma County v. Queen City Lodge No. 197, I.O.O.F.,* 195 Okl. 131, 156 P.2d 340, 358 [1945]; *Gibson v. Phillips University,* 195 Okl. 456, 158 P.2d 901, 903 [1945]; *Board of Equalization v. Tulsa Pythian Benev. Ass'n.,* 195 Okl. 458, 158 P.2d 904, 906 [1945]; *Yarbrough v. Okla. Tax Comm.,* 200 Okl. 402, 193 P.2d 1017, 1021 [1948], *aff'd.,* 334 U.S. 841, 68 S.Ct. 1510, 92 L.Ed. 1765; *Curtis v. Barby,* Okl., 366 P.2d 616, 621 [1961]; *Poafpybitty v. Skelly Oil Co.,* Okl., 394 P.2d 515, 520 [1964]; *Fidelity-Phenix Fire Ins. Co. v. Penick,* Okl., 401 P.2d 514, 517 [1965]; *American-First Title & Trust Co. v. Ewing,* Okl., 403 P.2d 488, 496 [1965]; *Irwin v. Irwin,* Okl., 433 P.2d 931, 934 [1965]; *Hughes v. City of Woodward,* Okl., 457 P.2d 787, 790 [1969]; *Kirkland v. General Motors Corp.,* Okl., 521 P.2d 1353, 1368 [1974]; *Brickner v. Gooden,* Okl., 525 P.2d 632, 638 [1974]; *Elk City v. Johnson,* Okl., 537 P.2d 1215, 1217 [1975]; *Keel v. MFA Ins. Co.,* Okl., 553 P.2d 153, 159 [1976]; *Scott v. Bradford,* Okl., 606 P.2d 554, 559 [1980]; *Southwestern Bell Tel. Co. v. Oklahoma County Excise Bd.,* Okl., 618 P.2d 915, 921 [1980]; *Wilsey, Bennett Co. v. Grant,* Okl., 632 P.2d 382, 386 [1981] and *Oklahoma Ed. Ass'n, Inc. v. Nigh,* Okl., 642 P.2d 230, 239 [1982]. See also Annot., Prospective or Retroactive Operation of Overruling Decision, 10 A.L.R.3d 1371, 1388, 1394 [1966].

homa delineate the effective date of judicial opinions. Subject to limited exceptions, decisions were given retrospective effect at common law.[1] However, the doctrine enunciated by the United States Supreme Court in *Great Northern R. Co. v. Sunburst Oil & Ref. Co.*, 287 U.S. 358, 364, 53 S.Ct. 145, 148, 77 L.Ed. 360, 85 A.L.R. 254 (1932) broadly endorses variations in juristic philosophy involving retrospective and prospective decisions.

My concern is that there be some consistency and predictability in our rulings. Within the last two years, numerous cases including *Cate v. Archon Oil Co., Inc.*, 695 P.2d 1352, 1356 (Okl.1985); *Vanderpool v. State*, 672 P.2d 1153, 1157 (Okl.1983); *Snethen v. Oklahoma State Union of the Farmers Educational and Cooperative Union of America*, 664 P.2d 377, 382 (Okl. 1983), have been promulgated. In each, the decision was given effect in the immediate case, and prospectively to all other cases, after either the issuance of the mandate, or on a date certain.

The alleged distinctions between collateral and direct attacks do not necessitate a different treatment than that accorded to recent successful appellants[2] because the judgment was void *ab initio*.[3] If a decision has been adequately foreshadowed, as has the holding in this case,[4] the benefits of the new rule should not be withheld from the prevailing party—nor should similarly situated litigants who properly have preserved the issue on appeal be bypassed, and left unaffected and unprotected in the appellate pipeline.[5]

---

1. *Robinson v. Neil*, 409 U.S. 505, 507, 93 S.Ct. 876, 877, 35 L.Ed.2d 29 (1973).

2. Within the last three years, no party has been denied the fruits of the appellate victory.

3. See *Pointer v. Hill*, 536 P.2d 358, 361 (Okl. 1975); and *Emery v. Goff*, 198 Okl. 534, 180 P.2d 175, 178, 171 A.L.R. 457 (1947).

4. *Bomford v. Socony Oil Co.*, 440 P.2d 713 (Okl. 1968) was decided 17 years ago.

5. *Shea v. Louisiana*, 470 U.S. 51, 105 S.Ct. 1065, 1069, 84 L.Ed.2d 38 (1985); *United States v. Johnson*, 457 U.S. 537, 102 S.Ct. 2579, 73 L.Ed.2d 202 (1982); *Mackey v. United States*, 401 U.S. 667, 675, 91 S.Ct. 1160, 1164, 28 L.Ed.2d 404 (1971).