Paul APRIL, M.D., and Paul A. April, M.D., Inc., an Oklahoma Corporation, Appellee,

v.

CITY OF BROKEN ARROW, Oklahoma, a Municipal Corporation, Appellant.

No. 66469.

Supreme Court of Oklahoma.

May 2, 1989.

As Corrected May 22, May 24 and July 12, 1989.

Rehearing Denied July 19, 1989.

**1348**

Louis Levy, Inc., by Louis Levy, Tulsa, for appellee.

Knowles & King by Dennis King and Brad Smith, Tulsa, Michael R. Vanderburg As City Atty., Broken Arrow, for appellant.

Russell R. Linker, II, Tulsa, as amicus curiae for The City of Tulsa, On behalf of appellant.

Diane Pedicord, Oklahoma City, as amicus curiae, For The Oklahoma Mun. League, on behalf of appellant.

DOOLIN, Justice.

The question presented is whether the adoption of two municipal land-use ordinances on their face substantially interfered with landowner's use and enjoyment of his property so as to constitute a permanent **"taking"** of property without just compensation in violation of the United States and Oklahoma Constitutions.[1] Put another way, the question is, does a taking result if the limitations on the use of owner's property do "not substantially advance legitimate state interests, or denies an owner economical, viable use of his land, [citations omitted]." [2]

**I.**

Appellee Paul April, M.D., ("Owner"), purchased 40 acres of undeveloped agricultural land, for investment purposes, in the City of Broken Arrow, Tulsa County, Oklahoma ("City"). City is a suburban residential area south of the city of Tulsa. Owner's real property, used as pasture land, is located within an existing 100–year flood plain of Haikey Creek and its tributaries ("Haikey"). Haikey is a "natural water drainage system" in and around City.

Property adjacent to Haikey, including Owner's land which is transversed by three pre-existing wet-weather creeks converging in the flood plain, is naturally subject to flooding following periods of heavy rainfall. Haikey drains over "one square mile" of Owner's property, because the elevation of Owner's property is lower than the ele-

---

1. The Fifth Amendment of the United States Constitution, as made applicable to the States through the Fourteenth Amendment, provides in part:

   No person shall be ... deprived of ... property, without due process of law; nor shall private property be taken for public use, without just compensation.

   In harmony with the foregoing constitutional language, article II, Section 24 of the Oklahoma Constitution goes further in the protection of private property by providing in part:
   ... Private property shall not be taken **or** damaged for public use without just compensation. (Emphasis added.)

   Further, title 66 O.S.1981 § 57 mandates:
   ... any ... municipality authorized to exercise the right of eminent domain shall have taken and occupied, ..., any land, without having purchased or condemned the same, with damage thereby inflicted upon the owner of such land shall be determined in the manner provided ... for condemnation proceedings.

2. *Agins v. City of Tiburon,* 447 U.S. 255, 260, 100 S.Ct. 2138, 2141, 65 L.Ed.2d 106 (1980).

vation of the periodic hundred year flood. City has not made any physical intrusions or entered upon Owner's property. Nor has City diverted any additional water into Haikey's drainage system, or erected any facilities upstream from Owner's property, or granted any building permits altering the natural water flow throughout the topography of the 100–year flood plain.

Owner, intending to sell his land to a developer, requested and was granted R–2 residential single family zoning for his property in 1975, after his previous request for R–6 high density multifamily apartment zoning was denied by City. When R–2 zoning was approved, allowing three family dwellings per acre, (theoretically 120 homes), City's planning commission and planning commission staff informed Owner:

> the majority of (your) property is within the 100–year frequency flood and is also within the adopted Flood Hazard Area ..., (therefore) the developer will be required to build all house pads at least one foot above the 100–year frequency flood elevation....

**3.** City's planning commission and staff has consistently denied Owner's (and every other similarly situated applicant's) petitions for any increase in zoning intensity for two reasons: one, Owner's applications were inconsistent with the City's comprehensive plan, which supports higher zoning intensity at the intersection of arterial streets with zoning intensity decreasing as distance from the intersection increases, thus, land development beyond one quarter mile of such intersections, such as Owner's property (and other landowners), is planned as R–2 single family developments; and two, because the subject property is flood prone, as established by studies conducted by the Flood Insurance Administration and the United States Army Corps of Engineers. Any increase in zoning intensity beyond R–2 would be in opposition to the health, safety, and welfare of future residents and others upstream and downstream from Owner's property.

**4.** This fact is alleged in an affidavit filed, but not introduced at trial, by Owner's attorney herein. In Owner's petition, counsel further stated he was "advised ... the ... Ordinance would soon be adopted and (Owner's) property would be designated 'restricted area' on which no construction would be permitted as traditionally known. (Owner's) counsel objected, advising the ... City Council their actions, in his

This was City's only regulatory requirement for development of land within the flood plain. In October 1977, Owner requested his property be rezoned from 40 acres of R–2, residental single family to 20 acres of R–4, duplex and 20 acres of R–5, apartments. Owner's request was denied by City's planning commission and staff.

In January 1978, Owner made another application to the City's planning commission, requesting his property be re-zoned from R–2 single family to R–4, Duplex. City's planning commission and staff again denied Owner's petition for re-zoning,[3] and Owner, for the first time, appealed to the City Council. "**[I]n anticipation** of the 'floodplain' ordinance being adopted ..., (Owner) sought relief in the form of a 'waiver' or variance from the ... City Council on March 13, 1978 which was, ..., denied...."[4] (Emphasis added.)

On March 20, 1978, the city council enacted "The Flood Damage Protection Ordinance, No. 735",[5] regulating the development of land in Haikey's flood plain, and "The Earth Change Resolution Ordinance

opinion, amounted to a 'taking or damaging' ... and was told by the Mayor ... 'this might be so, so you had better test the new flood ordinance in Court.'"

**5.** City's flood plain ordinance, administered and enforced by the city manager, limits development within the one hundred year flood plain by requiring a building permit, which is also issued by the city manager. The general provisions covering the basis for establishing areas of special flood hazards [§ 3(B)(3) ], provides that:

> The floodplain, at locations where the point in question has a drainage area of over one square mile shall be reserved for flood tolerant uses.

Section 5(D), "Flood Tolerant Land Uses," provides that the:

> Flood plain may be utilized for, **but not limited to,** the following uses: (1) Recreational Parks; (2) Linear Park or Tree belt; (3) School Playground; (4) Common Area or Open Spaces; (5) Golf Course or Driving Range; (6) Nature Areas; (7) **Backyards;** (8) Parking Lots; (9) Drive-in Theaters; (10) Agriculture or Stables; (11) Landscape Nursery or Nursery Stock Production; (12) **Other uses consistent with terms of the ordinance.** (Emphasis added).

City's flood plain appeal board hears request for variances or modifications from the require-

No. 736",[6] controlling all excavations and earth modifications throughout the municipality (both hereinafter, "Land–Use Ordinances"). Both land-use ordinances became effective immediately. On May 1, 1978, the city council denied Owner's appeal for rezoning.

Owner initiated the present inverse condemnation suit in December of 1978, alleging, inter alia, City's "overt actions;" that is, adoption of its land-use ordinances, limiting his property to "Flood Tolerant Land Uses,"[7] and city's approval of building permits to other developers in the flood plain has resulted in the appropriation of Owner's property for "general public use" as "a detention pond as part of a municipal stormwater drainage system." Owner further alleges City's action prohibits construction on Owner's land by restricting its use to "public or semi-public purposes," that it effectively limits Owner's use of his land as a "horse pasture," and finally that it denies Owner beneficial use of his property by destroying his reasonable "investment-backed expectations." After various motions and pleadings, Owner dismissed three other causes of action.[8]

At trial, Owner asserted his "property lies in the path of (City's) **future plans** for a public park, Haikey Creek detention reservoir, levee pump station and channel improvements." (Emphasis added.) Owner argued City's land-use ordinance "goes too far," because his property is "economically worthless, as evidenced by the Report of Commissioners," appointed by the trial court. The commissioners' report found

the value of Owner's property "taken and damaged," resulting from City's enactment of the land-use ordinances, amounted to $240,000.00.

Before and during trial, City insistently argued two propositions to support its contention that there was no basis in either fact or law for the trial court to determine the constitutionality of the ordinances as applied to Owner's property. One, City's mere enactment of its ordinance regulating the general use of land within the flood plain does not, as a matter of law, constitute substantial interference with nor amount to an overt action exercising dominion and control over Owner's property, because Owner's property floods as a result of a natural phenomenon beyond City's exercise of its police power. Two, Owner has never applied for or been denied a building permit, or a variance under the land-use ordinances, thus, Owner has an adequate remedy at law to determine the beneficial use of his property.

City urged dismissal of Owner's action because the trial court lacked a justiciable issue. However, the jury rendered a verdict in favor of Owner and against City for $240,000.00. Thereafter, the trial court awarded attorney fees, appraisers fees, city engineering-planning fees, and trial cost against City pursuant to 27 O.S.1981 § 12. Owner retains possession of the land in question.

## II.

In resolving this appeal we are confronted, as we were in *Mattoon v. City of*

ments of the floodplain ordinance, and any aggrieved landowner may appeal to the city council.

**6.** City enacted this ordinance to protect "the general health, safety, and welfare of (its) citizens from the hazards and dangers of flooding or improper drainage by imposing standards and conditions upon the excavating, grading, regrading, landfilling, berming, and diking of land within the city." Any major earth changes on any tract of land in City over five acres in size must be approved by the city manager, who then issues a permit. This ordinance also has a variance system, and allows aggrieved landowners to appeal to city's flood plain appeal board and to the city council. Any landowner

with property in the flood plain would be required to obtain an earth change permit to raise land out of the flood plain. Once land is out of the flood plain, the landowner's use of his property is no longer restricted to the flood tolerant land uses; however, a building permit must be granted to develop the land.

**7.** See n. 5, supra.

**8.** Owner's three other causes of action were for: one, inverse condemnation for temporary damages; two, for trespass, and three, for injunctive relief and declaratory judgment.

*Norman,*[9] with the following contentions: One, whether a municipality's adoption of a flood plain ordinance constitutes a taking of property without just compensation for which a landowner may seek damages under an action in inverse condemnation. Two, whether the doctrine requiring exhaustion of administrative remedies is applicable to preclude judicial review of the action.

City and its amici argue that opinion does not control the instant case, because *Mattoon* is significantly distinguishable. Owner argues *Mattoon* provides the applicable rule to govern the results of this appeal. Therefore, we deem it important to reiterate, and go further into the statement of our opinion and reasons for our *Mattoon* decision, because due to the procedural posture of that appeal, we found ourselves unable to address the merits of the "taking" question.

In *Mattoon*, city enacted a flood plain ordinance, reserving landowner's (and approximately 500 other similarly situated landowners') property for flood drainage purposes. Landowner filed a class action for inverse condemnation, alleging city adopted its flood plain ordinance unreasonably, neglected and refused to properly maintain its drainage system, and had diverted surface waters into tributaries which crossed and flooded landowner's property. The trial court sustained city's

demurrer to landowner's petition by merely finding the ordinance was a valid exercise of city's police power. See n. 16 infra.

We recognized "a valid enactment of a flood plain ordinance is not per se a taking,"[10] because "acts done in the proper exercise of the police power which merely impair the use (or value) of property do not constitute a 'taking.' "[11] We held "the test of whether there can be a recovery in inverse condemnation is whether there is a sufficient interference with the landowner's use and enjoyment to constitute a taking."[12] More importantly, we acknowledged governmental land-use regulations may amount to an actual or de facto taking —"(i)f there is an **overt act** by the governmental agency resulting in an assertion of dominion and control over property."[13] (Emphasis added.)

Two components were implicit in the taking claim advanced by landowner's petition in *Mattoon*. First, landowner had alleged city's unreasonable adoption of its flood plain ordinance had "taken" his property, that is, the ordinance "goes too far," and any proffered compensation was not "just."[14] Thus, landowner's factual contentions adequately alleged a "regulatory taking" claim, by contending city's ordinance was an extreme regulation destroying a major portion of landowner's property value. Second, landowner alleged a

---

9. 617 P.2d 1347 (Okl.1980).

10. Id., at 1351. See also, *Hodel v. Virginia Surface Mining & Reclamation Assn.,* 452 U.S. 264, 293–297, 101 S.Ct. 2352, 2369–2371, 69 L.Ed.2d 1 (1981) (Governmental body's mere assertion of regulatory jurisdiction does not constitute a taking.)

11. Id., at 1349. See also, *Danforth v. United States,* 308 U.S. 271, 285, 60 S.Ct. 231, 236, 84 L.Ed. 240 (1939) ("A reduction or increase in the value of property may occur by reason of legislation for or the beginning or completion of a project; [however], (s)uch changes in value are incidents of ownership. They cannot be considered as a 'taking' in the constitutional sense."); *Agins,* n. 2 supra, 447 U.S., at 263, n. 9, 100 S.Ct., at 2143, n. 9 ("Mere fluctuations in value during the process of governmental decisionmaking, absent extraordinary delay, are 'in-

cidents of ownership.' "); *First English Evan. Luth. Ch. v. Los Angeles Cty.,* 482 U.S. 304, 318–20, 107 S.Ct. 2378, 2388, 96 L.Ed.2d 250 (1987) ("[D]epreciation of value of property by reason of preliminary activity is not chargeable to the government.")

12. Id.

13. Id. "The general rule, at least, is that while property may be regulated to a certain extent, if regulation goes too far it will be recognized as a taking. [T]his is a question of degree—and therefore cannot be disposed of by general propositions." *Pennsylvania Coal Co. v. Mahon,* 260 U.S. 393, 415, 43 S.Ct. 158, 160, 67 L.Ed. 322 (1922).

14. See e.g., *Kaiser Aetna v. United States,* 444 U.S. 164, 178, 100 S.Ct. 383, 392, 62 L.Ed.2d 332 (1979).

"physical taking" of property, that is, city also *overtly* acted to flood landowner's property by unreasonably diverting surface water, and improperly maintaining its drainage channels.[15]

Accordingly, we reversed and remanded the trial court's judgment with directions to reinstate landowner's action, because first, merely finding an ordinance was validly enacted within city's lawful exercise of its police power, without considering the **general principles of due process,** does not "absolutely preclude compensation for property taken or damaged by such exercise."[16] (Emphasis added.) Second, landowner's petition alleged a question of fact, the reasonableness of city's diversion of surface water over landowner's property, and such challenge was sufficient to withstand city's demurrer.

We held the administrative remedies available to landowner, an appeal or a variance, were wholly inadequate, and therefore, the exhaustion requirement was excused for three reasons. One, the property would continue to flood, thereby causing continued economic hardship to landowner. Two, the issue of fact raised in landowner's petition did not require the exercise of any agency's discretion and expertise. Finally, after outlining the purposes of the exhaustion of administrative remedies,[17] we reasoned the doctrine's basic rationale, avoidance of premature judicial interference, was in no way offended. Moreover, under the facts presented in *Mattoon,* we held "(t)here is no **administrative remedy** for compensating a landowner for a governmental taking."[18] (Emphasis added.) In keeping with these views, we now turn to an analysis of Owner's taking claim here.

### III.

In cases such as this, the **nature** of the government's action and the **type of taking** alleged are critical factors in our analysis.[19] Without undertaking to survey the historical intricacies of regulatory zoning ordinances it is fair to say—any local government seeking to participate in the National Flood Insurance Program is required by federal law and authorized by state law to enact land use and regulatory control measures.[20] Other provisions enforcing such measures, (including a building permit and appeal system), are also required in mitigating flood hazards. City's legitimate exercise of its police power, asserted for the public welfare, controls owner's use of his property.

In balancing the private and public interests herein, Owner's potential use of all property, under our system of government, is subordinate to the right of City's reasonable regulations, ordinances, and all similar laws that are clearly necessary and bear a rational relation to preserving the

**15.** Flooding is an easily identifiable physical invasion which destroys all uses of property and is virtually always deemed to constitute a "taking." See e.g., *Pumpelly v. G.B. & M. Canal Co.,* 80 U.S. (13 Wall.) 166, 20 L.Ed. 557 (1871); *City of Wewoka v. Mainard,* 155 Okl. 156, 8 P.2d 676 (1932).

**16.** *Mattoon,* 617 P.2d, at 1349. Accord, *Frost v. Ponca City,* 541 P.2d 1321 (Okl.1975). "[A] strong public desire to improve the public condition is not enough to warrant achieving the desire by a shorter cut than the constitutional way of paying for the change." *Pennsylvania Coal Co.,* 260 U.S., at 416, 43 S.Ct., at 160.

**17.** See, *Mattoon,* 617 P.2d at 1350, summarizing from *McKart v. United States,* 395 U.S. 185, 193–195, 89 S.Ct. 1657, 1662–1663, 23 L.Ed.2d 194 (1969).

**18.** Id. "[W]here the government's activities have already worked a taking of all use of property, no subsequent action by the government can relieve it of the duty to provide compensation for the period during which the taking was effective." *First English Evan. Luth. Ch.,* 482 U.S., at 320–22, 107 S.Ct., at 2389.

**19.** *Mugler v. Kansas,* 123 U.S. 623, 8 S.Ct. 273, 31 L.Ed. 205 (1887); *Welch v. Swasey,* 214 U.S. 91, 29 S.Ct. 567, 53 L.Ed. 923 (1909).

**20.** National Flood Insurance Act of 1968, 42 U.S.C.A. § 4001, et seq.; Oklahoma Floodplain Management Act, 82 O.S.1981 § 1601, et seq.

health, safety, and general welfare of the residents of Broken Arrow.[21]

Owner argues unpersuasively his property was worth $280,000.00 "before City took action to appropriate the property for a regional detention pond," and now his property is only worth $40,000.00. " 'Although a comparison of values before and after' a regulatory action 'is relevant ... it is by no means conclusive ...' " [22] Thus, we reject Owner's implicit conclusion that he "has the constitutional right to leave his land vacant and not have its value impaired by the conduct of (City) officials." Our conclusion is strongly buttressed by the general truism expressed by Justice Holmes, more than 65 years ago, in *Pennsylvania Coal Co. v. Mahon:* [23]

> Government hardly could go on, if to some extent, values incident to property could not be diminished without paying for every such change in the general law. As long recognized, some values are enjoyed under an implied limitation, and must yield to the police power. But obviously the implied limitation must have its limits, or the contract and due process clauses are gone. One fact for consideration in determining such limits is the extent of the diminution. When it reaches a certain magnitude, in most if not in all cases there must be an exercise of eminent domain and compensation to sustain the act. So the question depends upon the particular facts.

While asserted with great vigor, Owner's argument that City has appropriated his property for general public use as a detention reservoir, is quite simply untenable under the **particular facts** of this case. We find no evidence, or persuasive testimony, indicating City has adopted any recommendations with respect to appropriating Owner's land as a detention pond. City has acquired no property interest in Owner's land, has not physically invaded Owner's property, nor has his land been set aside for a public use.

Indeed, Owner stipulated City has not proposed or approved the building of any facilities or taken any action increasing the natural flow of water over Owner's property or flooding his land. We note that as a result of Pre Trial Conference, Sec. 9 thereof, the owner declared and admitted;

> "9. (1) That the City of Broken Arrow has **not** constructed or caused to be constructed **any** facilities upstream from plaintiff's property which has increased the waterflow over plaintiff's property." [emphasis added] Unlike the extreme factual circumstances found in *Mattoon,* in the instant case, Owner's property floods following periods of heavy rainfall, and such a natural phenomenon is definitely beyond City's ordinary exercise of its police power.

▇ Furthermore, even if Owner's allegations were substantiated by the record, City's **future plans** for inclusion of his property for **"potential"** public use in a flood control plan would not give rise to a cause of action for inverse condemnation. For as Justice Stewart wrote in his concurring opinion in *Hughes v. Washington:* [24] "[T]he Constitution measures a taking of property not by what a state says, or what it intends, but by what it does."

21. *Keystone Bituminous Coal Ass'n v. DeBenedictis,* 480 U.S. 470, 107 S.Ct. 1232, 1242, 94 L.Ed.2d 472 (1987).

22. Id., 480 U.S. 470, 107 S.Ct. at 1245 [quoting *Goldblatt v. Hempstead,* 369 U.S. 590, 594, 82 S.Ct. 987, 990, 8 L.Ed.2d 130 (1962)]. In challenging the commissioner's report, City argues there was no actual showing of any diminution of value in Owner's land resulting from the land-use ordinances, because Owner's witnesses based the extent of injury on the false assumption that Owner's land had to forever remain in its current use, a horse pasture, without any possibility of change.

23. 260 U.S., at 413, 43 S.Ct., at 159. See also, n. 11 supra.

24. 389 U.S. 290, 298, 88 S.Ct. 438, 443, 19 L.Ed.2d 530 (1967). "The mere enactment of legislation which authorizes condemnation of property cannot be a taking. Such legislation may be repealed or modified, or appropriations may fail." *Danforth,* supra n. 11, 308 U.S. at 286, 60 S.Ct. at 237.

■ Accepting as we must the general proposition that local public officials must be afforded reasonable "elasticity" in planning and implementing legitimate land-use interests, and given the "particular facts" of this case; we hold such limitations substantially advance City's legitimate goals of; one, reducing risks of loss of life and property; two, protecting the public's interest in health; three, preserving the aesthetic environment and fiscal integrity of Haikey's flood prone areas; four, enabling landowners to develop their property located within the flood plain, as well as allowing landowners to purchase federally-sponsored flood hazard insurance to protect their investments.

Our conclusion that City's land-use ordinances are lawful and valid exercises of its police power does not conclude this matter; for as we explicitly held in *Mattoon,* such a mere finding does not "absolutely preclude compensation for property taken or damaged by such exercises."[25] In this connection, we proceed then to a consideration of whether Owner has been denied economical viable use of his land.

## IV.

It is relevant at this juncture to recognize Owner merely alleges a "regulatory taking" of property. Given the absence of any administrative decision regarding the application of City's land-use ordinances to Owner's property, City and its amici challenge our appellate jurisdiction and the trial court's adjudicatory authority, arguing Owner's "regulatory taking" claim is premature, because "an essential prerequisite to its assertion is a final and authoritative determination of the type and intensity of development legally permitted on the subject property."[26] We agree.

Owner is completely incorrect when he asserts he has no "adequate" remedy at

law.[27] Owner alleged the development of 120 homesites "was permitted by existing zoning" prior to City's adoption of its land-use ordinances. Owner asserts such development "is not consistent with the terms of the ordinance (and) if permitted would seriously undermine the purpose of the ordinances." Owner contends he requested a waiver or variance from the city council by agreeing to reduce the number of dwelling units from 120 to 88. Owner further asserts he asked City to repeal the effect of the ordinance as it pertains to his property. This argument is misleading, and inaccurate.

Owner has never submitted a plan or subdivision plat to use or improve his real property. Nor did he properly seek and receive any concrete and definitive statement from City as to how many single family dwelling units he could build on his land, if the floor of such dwelling units were built one foot above the existing 100–year flood elevation.

Regardless of how many homesites are erected, City's land-use ordinances neither prevent the present and presumably most beneficial use of Owner's property, "nor extinguish a fundamental attribute of ownership."[28] The disputed property, as earlier requested by Owner, is still zoned for single residental family dwellings.

Furthermore, and most significant, Owner has never applied for a building permit to develop his property, or an earth change permit to raise his land out of the flood plain, nor has he ever properly requested a hardship variance under the "established" administrative procedures of the land-use ordinances. In summary, the record indicates Owner failed to submit a plan for development of his property prior to or subsequent to the City's adoption of its land-use ordinances.

On April 3, 1978, during his rezoning appeal, Owner's application was amended

---

**25.** 617 P.2d, at 1349.

**26.** *MacDonald, Sommer & Frates v. Yolo County,* 477 U.S. 340, 348, 106 S.Ct. 2561, 2566, 91 L.Ed.2d 285 (1986). City further contends Owner's "sole basis for claiming damages for a taking was the regulatory paperwork generated by the land-use ordinances." We are inclined to agree.

**27.** See nn. 4–6 and accompanying text, supra.

**28.** *Agins,* supra n. 2, 477 U.S. at 262, 100 S.Ct. at 2142.

and an 88 lot sketch plat was submitted to Broken Arrow's city council. However, the minutes of the city council meeting clearly show "Mr. Levy requested the application remain as submitted, R–2 (single family) to R–4 (duplex)." This belies Owner's contention he "sought relief in the form of a waiver or variance." City's mere refusal to rezone Owner's property cannot be considered as either an actual taking or a de facto taking.

Furthermore, the record shows during trial, City left open the possibility that some development will be permitted on Owner's property under the land-use ordinances. Under cross-examination, even Owner's expert witness testified it was possible for Owner to obtain building permits to develop his property while complying with City's land-use ordinances.

Owner's attempt to short-circuit City's administrative process is not well taken. As this Court explained in *Martin v. Harrah Independent School District,*[29]

> It has long been established in Oklahoma that exhaustion of statutory administrative remedies is a jurisdictional prerequisite for resort to the courts. (citations omitted) It is only where administrative remedies are not adequate that the courts may take jurisdiction prior to actual exhaustion of administrative remedies, and then a strong showing is required as to the alleged inadequacy of a prescribed administrative remedy. (citations omitted)
>
> \* \* \* \* \* \*
>
> The *doctrine requiring administrative relief ... does not require merely the initiation of prescribed administrative remedies, but that they be pursued to their final outcome before judicial intervention is sought.* (Emphasis added.)

Since "this Court has the power and duty to inquire into the propriety of our jurisdiction as well as the jurisdiction of the court from which appeal arises,"[30] we think it quite apparent in the instant case that this Court cannot entangle itself in the abstract disagreements over the application of City's land-use ordinances to Owner's property until a final administrative decision has been formalized, issued by the city manager, and its effects felt in a concrete way by Owner.

As far as the United States Constitution is concerned, only the most extreme and onerous regulations can constitute a regulatory taking. In *United States v. Riverside Bayview Homes, Inc.,*[31] the United ed States Supreme Court has:

> made it quite clear that the mere assertion of regulatory jurisdiction by a governmental body does not constitute a regulatory taking. (Citation omitted.) The reasons are obvious. A requirement that a person obtain a permit before engaging in a certain use of his or her property does not itself 'take' the property in any sense: after all, the very existence of a permit system implies that permission may be granted, leaving the landowner free to use the property as desired. Moreover, even if the permit is denied, there may be other viable uses available to the owner. *Only when a permit is denied and the effect of the denial is to prevent 'economically viable' use of the land in question can it be said that a taking has occurred.* (Emphasis added.)

We conclude the trial court was presented with no justiciable issue to hear Owner's regulatory taking claim, because Owner has never applied for a building or earth change permit, has failed to exhaust his administrative remedies, and has presented no competent evidence showing the pursuit of such remedies would be futile or inadequate. We hold there is as yet

**29.** 543 P.2d 1370, 1372–1374 (Okl.1975).

**30.** *In re Matter of Initiative Petition Filed November 15, 1983,* 718 P.2d 1353, 1354 (Okl.1986); *Hayhurst v. Hayhurst,* 421 P.2d 257 (Okl.1966). See also, *Ricks Exploration Co. v. Oklahoma Water Resources Bd.,* 695 P.2d 498, 502 (Okl. 1984). "This (C)ourt cannot affirm a district court decision which—based on the issues raised—would give the district court a sweep of cognizance broader than that sanctioned by law."

**31.** 474 U.S. 121, 126–127, 106 S.Ct. 455, 459, 88 L.Ed.2d 419 (1985). Accord, *Agins,* supra n. 2; *Hodel,* supra n. 10; *MacDonald, Sommer & Frates,* supra n. 26.

no concrete controversy regarding the application of City's land-use ordinances to Owner's property, because even though City has denied Owner's increased zoning intensity applications, there are other economically viable uses available to Owner.

Lastly, it is important to note that Owner purchased flood-prone property in Haikey Creek and its tributaries. Even if City had taken no action with regards to flood-damage prevention, Owner's property would continue to flood following periods of heavy rainfall.

The judgment of the trial court is REVERSED, and the cause is REMANDED to the district court WITH DIRECTIONS TO DISMISS Owner's complaint—for want of a justiciable issue.

HARGRAVE, C.J., and HODGES, LAVENDER, SIMMS, ALMA WILSON, KAUGER and SUMMERS, JJ., concur.

OPALA, V.C.J., concurs in part; dissents in part.