1999 OK 1

In the Matter of the Application of the **OKLAHOMA BOLL WEEVIL ERADI-CATION ORGANIZATION** for Approval of $5 Million Oklahoma Boll Weevil Eradication Organization Assessment Note, Series 1998.

No. 92135.

Supreme Court of Oklahoma.

Jan. 19, 1999.

Gary M. Bush, Fagin, Brown, Bush, Tinney & Kiser, Oklahoma City, for Oklahoma Boll Weevil Eradication Organization.

PER CURIAM.

¶1 The "Boll Weevil Eradication Act"[2] [Act] became effective September 1, 1993. The Oklahoma Boll Weevil Eradication Organization [Organization] is a state governmental agency created by the Act and authorized to exercise the rights, privileges, and functions specified by that enactment. In this proceeding, entertained in the exercise of the court's statutorily mandated original jurisdiction, Organization seeks approval of the Boll Weevil Eradication Organization Assessment Note, Series 1998 [Note].[3]

## I

### HEARING

¶2 Statutorily mandated notice[4] of the hearing on the application of that organization (set for November 18, 1998 at 9:00 a.m.) was given by publication, one time, in each of the following newspapers:

The Daily Oklahoman, November 4, 1998;

Tulsa World, November 5, 1998;

The Lawton Constitution, November 5, 1998.

The notice informed all persons interested they could (a) *file* protests against the validation and of approval of the note, (b) *be present* at the hearing and (c) *contest* the bond's approval. These published notices

3. 2 O.S.Supp.1997 § 3–50.7(B)(20)

4. 2 O.S.Supp.1997 § 3–50.7(B)(20)(b).

2. 2 O.S.Supp.1997 §§ 3–50.1 et seq.

are found to fulfill the statutory notice requirement.[5]

¶ 3 A hearing was held as provided in the published notice. No person or organization appeared in opposition to the application. No protest was filed against the validation or approval of the note, the subject of the application. No person or organization was present at the hearing to contest the application presented by the applicant, Oklahoma Boll Weevil Eradication Organization.

¶ 4 We hold there was compliance with the statutory prerequisites for notice and hearing on the organization's application for the bond's approval.

## II

## AUTHORIZATION

¶ 5 The terms of 2 O.S.Supp.1997 § 3–50.7(B)(19) authorize the organization to issue and sell bonds, or otherwise borrow money, in such amounts as shall be needed from time to time for the purpose set forth in the Act.[6] Subdivision (d)[7] expressly provides that bonds[8] issued pursuant to the Act shall not be an indebtedness of the State of Oklahoma but shall be special obligations payable solely from the assessments.

## III

## STATUTORY COMPLIANCE AS TO MATURITY AND PAYMENT

¶ 6 The note is to be paid over a period of years. The period does not exceed the statutorily allowed time for maturity of not more than 20 years.[9]

¶ 7 The note is a special obligation payable solely from assessments.

5. 2 O.S.Supp.1997 § 3–50.7(B)(20)(b).

6. 2 O.S.Supp.1997 § 3–50.7(B)(19).

7. 2 O.S.Supp.1997 § 3–50.7(B)(19)(d).

8. The terms of 2 O.S.Supp.1997 § 3–50.7(C) provide:

"As used in subsection B of this section, 'bonds' means bonds, notes, loan agreements,

## IV

## APPROVAL

¶ 8 The note has been found valid by the Attorney General *qua* Ex–Officio Bond Commissioner of the State of Oklahoma. The Attorney General and the State Auditor and Inspector have found that the note is (a) issued pursuant to law and (b) within the debt limit provided by law.[10]

## V

## ASSESSMENT REFERENDUM

¶ 9 As required by the Act, a referendum was held among Oklahoma cotton growers.[11] Applicant Organization advises that public hearings were conducted at some 25 locations around the State for informational and educational purposes prior to the referendum. Notice of the election was published in some 50 local newspapers and in the Daily Oklahoman, Tulsa World, and Lawton Constitution. The election was also advertised on television stations serving the cotton area as well as on several radio stations.

¶ 10 The statutory requirements to be included in the ballot were met: (1) the maximum assessment to be paid by cotton growers in the district, (2) the period of time for which the assessment will be levied, and (3) the method and manner of assessment.[12]

¶ 11 The maximum assessment was established at $7.50 per acre of cotton ground plus 1 cent per pound of actual production of lint. The assessment is to be in effect for not more than 10 years and collected at the cotton gin.

¶ 12 The election was conducted during the period of October 1 to October 15, 1997 by direct mailing of ballots to the compiled list of Oklahoma cotton growers. The as-

or other forms of indebtedness issued or delivered by the Oklahoma Boll Weevil Eradication Organization."

9. 2 O.S.Supp.1997 § 3–50.7(B)(19)(a)(3).

10. 2 O.S.Supp.1997 § 3–50.7(B)(19)(f).

11. 2 O.S.Supp.1997 § 3–50.9.

12. 2 O.S.Supp.1997 § 3–50.9(F).

sessment was approved by vote of 1768 in favor and 244 against. This exceeds the minimum requirement of at least 60% of those voting to be in favor of the assessment.[13]

¶ 13 A transcript of the election was approved by the Attorney General as statutorily required.[14]

## VI

### EQUALITY OF ASSESSMENT

¶ 14 The assessment is made to apply equally to all Oklahoma cotton growers. This is a reasonable and lawful classification of citizens considering the project involved. *Olustee Co.-op Assn. v. Oklahoma Wheat U.R. & M.D.C.*[15] is not controlling as to this assessment referendum. In that opinion, an act providing for the imposition of a promotional fee on the sale of wheat was constitutionally infirm because it did not apply to wheat grown in counties having 10,000 or more allotted wheat acres.

## VII

### SUMMARY

¶ 15 There has been compliance with the "Boll Weevil Eradication Act." The application of Oklahoma Boll Weevil Eradication Organization is granted. The Oklahoma Boll Weevil Eradication Organization Assessment Note, Series 1998, is determined to be valid upon issuing and is approved.

Rule-governed rehearing time[16] is shortened from 20 to 10 days.[17]

¶ 16 **BONDS APPROVED.**

13. 2 O.S.Supp.1997 § 3–50.9(I).

14. 2 O.S.Supp.1997 § 3–50.9(F)(3).

15. 1964 OK 81, 391 P.2d 216, 218–219.

16. Rule 1.13, Oklahoma Supreme Court Rules, 12 O.S.Supp.1997, Ch, App. 1.

17. 2 O.S.Supp.1997 § 3–50.7(B)(20)(c).

1. 2 O.S.Supp.1997 §§ 3–50.1 et seq. Section 3–50.7(B)(20) of the Act mandates this court's consideration of this cause.

¶ 17 HARGRAVE, V.C.J., HODGES, LAVENDER, SIMMS and WATT, JJ., concur.

¶ 18 KAUGER, J., concurs in result.

¶ 19 ALMA WILSON, J., concurs in part and dissents in part.

¶ 20 OPALA, J., dissents.

¶ 21 SUMMERS, C.J., not participating.

OPALA, J., dissenting.

¶ 1 Acting in the exercise of its *cognizance mandated* by the Boll Weevil Eradication Act[1] [Act], the court approves today the proposed $5 Million Assessment Note, Series 1998 [Note] that represents bonded indebtedness to be issued by the Oklahoma Boll Weevil Eradication Organization [OBWEO or applicant]. The court's endorsement *rests solely* on the applicant's *compliance with statutory requirements* for the issuance of bonds whose proceeds will provide funds for the boll weevil eradication program.

¶ 2 I must recede from placing imprimatur upon the proposed bond issue. This is so because, when our cognizance of the subject matter is gauged by the standards of *Mullane*,[2] *Schroeder*[3] and *Mennonite*,[4] the court is patently without *in personam* jurisdiction over the issues in the case. Moreover, anterior to passing on the constitutional sufficiency of notice—given here solely by publication—I would call upon the applicant to brief another *equally critical issue* of whether the "assessment referendum" that gave birth to the bond issue now before us is constitutionally infirm because it was conducted in a

2. *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 313–15, 70 S.Ct. 652, 656–57, 94 L.Ed. 865 (1950).

3. *Schroeder v. City of New York*, 371 U.S. 208, 211, 83 S.Ct. 279, 281–282, 9 L.Ed.2d 255 (1962).

4. *Mennonite Bd. of Missions v. Adams*, 462 U.S. 791, 798, 103 S.Ct. 2706, 2711, 77 L.Ed.2d 180 (1983).

manner offensive to the teachings of *Kramer*[5] and *Cipriano*.[6]

## I

## NOTICE TO COTTON GROWERS MUST PASS DUE PROCESS MUSTER

¶ 3 Oklahoma *cotton producers* approved, at a 1997 "election",[7] a boll weevil eradication program to be funded *solely* from assessments to be made against them. Only the members of that class of electors received *personal notice* and were permitted to vote in the referendum.[8] In furtherance of the eradication program, OBWEO approved a $5 million note, to be repaid solely from assessment-derived revenue. It now seeks this court's validation of the bond issue. In conformity with the Act's provisions, notice[9] *of this legislatively mandated original proceeding was given solely by publication* informing the public that interested persons may file protests against the Note's issuance as well as present themselves to contest its legality.

¶ 4 For the decision that is to be made in this proceeding the *Mullane/Schroeder/Mennonite* trilogy[10] requires *more* than service *solely by publication*. Notice conformable to the standards of due process is a *sine qua non* element of judicial cognizance.[11] Jurisdiction must rest on notice that under all the circumstances is reasonably calculated to apprise interested parties of the pendency of a proceeding and to afford them an opportunity to present their objections.[12] As the

5. *Kramer v. Union Free Sch. Dist. No. 15*, 395 U.S. 621, 89 S.Ct. 1886, 23 L.Ed.2d 583 (1969).

6. *Cipriano v. City of Houma*, 395 U.S. 701, 89 S.Ct. 1897, 23 L.Ed.2d 647 (1969).

7. The election, called an *assessment referendum*, was conducted by mail. The votes were cast by ballots returned to the Oklahoma Department of Agriculture.

8. OBWEO compiled a list of cotton producers statutorily eligible to participate in the referendum, to whom ballot forms, voting instructions and a return envelope were mailed. According to an undated Oklahoma Department of Agriculture letter (entitled Election Procedures for the Oklahoma Boll Weevil Eradication Referendum) "[a]ll individuals, firms, corporations or partnerships that are actively engaged in the production of cotton (1997) or who were actively engaged in the production of cotton two (2) of the last three years (1994, 1995, 1996) were *eligible to vote in* this referendum." (Emphasis supplied). The Department's letter follows the statutory text. 2 O.S.Supp.1997 § 3–50.9(C).

9. The terms of 2 O.S.Supp.1997 § 3–50.7(B)(20)(b) are:

"Notice of the hearing on each application shall be given by a notice *published in a newspaper* of general circulation in the state that on a day named, the board of directors will ask the court to hear its application. Such notice shall inform all persons interested that they may file protests against the validation or approval and be present at the hearing and contest the same. Such notice shall be published one time, not less than ten (10) days prior to the date named for the hearing, and the hearing may be adjourned from time to time at the discretion of the court." (Emphasis supplied).

10. Under *Mullane, supra* note 2, 339 U.S. at 313–15, 70 S.Ct. at 656–57, and its progeny, one who seeks to alter another's legal rights must give actual notice to the latter before a court can act upon the claim. In *Schroeder, supra* note 3, 371 U.S. at 211, 83 S.Ct. at 282, the Court concluded that posted and published notice of condemnation proceedings is inadequate to afford the landowners an opportunity to defend against the loss of their rights in land. Actual notice, the Court opined, is due all "known or very easily ascertainable" holders of interest to be affected. *Id.* 371 U.S. at 212–13, 83 S.Ct. at 282. In *Mennonite, supra* note 4, 462 U.S. at 798, 103 S.Ct. at 2711, the Court reinforced *Mullane* by announcing that notice by mail or other means equally effective is the minimum constitutional requirement. More than publication notice is required when the proceeding adversely affects the property interests of reasonably ascertainable persons. The state's failure to provide the mortgagee with actual notice of the tax sale violates due process, because "reasonably diligent efforts" could have identified the mortgagee and ascertained its address. *Id.*

11. *Mullane, supra* note 2, 339 U.S. at 313–15, 70 S.Ct. at 656–57; *Schroeder, supra* note 3, 371 U.S. at 211, 83 S.Ct. at 282; *Mennonite, supra* note 4, 462 U.S. at 798, 103 S.Ct. at 2711. *See also Cate v. Archon Oil Co.*, 1985 OK 15, 695 P.2d 1352, 1355–56; *Bomford v. Socony Mobil Oil Co.*, 1968 OK 43, 440 P.2d 713, 718.

12. *Mullane, supra* note 2, 339 U.S. at 314, 70 S.Ct. at 657. *Due process is violated by the mere act of exercising judicial power upon process not reasonably calculated to apprise interested parties of the pendency of an action. Boddie v. Connecticut*, 401 U.S. 371, 378, 91 S.Ct. 780, 786, 28 L.Ed.2d 113 (1971); *Armstrong v. Manzo*, 380 U.S. 545, 85 S.Ct. 1187, 14 L.Ed.2d 62 (1965);

Constitution inexorably commands, no one's rights may be adversely affected in the absence of *due and timely notice* that affords a full and fair opportunity to defend. *Actual notice* is constitutionally due to all those persons whose interest in the litigation to be prosecuted is "known or very easily ascertainable".[13]

¶ 5 Once a person has been identified as one to whom notice is due, diligence must be exercised in ascertaining that person's last whereabouts for giving personal notice of the pendency of proceedings at a meaningful time and in a meaningful manner.[14] This state's own jurisprudence,[15] implemented by Rule 16, Rules for the District Courts,[16] clearly articulates this very notion. In every case of *statutorily mandated original jurisdiction*, such as the present, this court should always insist *on the very same notice standards* as those that constitutionally govern like proceedings conducted in the district courts.

¶ 6 While the Act provides that eligible voters shall be allowed—by future assessment referenda—periodically to decide whether the assessments are to continue,[17] the borrowing program (and the pledged assessments to repay) cannot be terminated until all outstanding OBWEO indebtedness has been retired.[18] The cotton growers who were eligible to vote in the 1997 "referendum" (and were notified by mail of that election) are hence entitled to a better notice of this proceeding than that which is prescribed by the pertinent provisions of the Act.[19] They are *in this case* to be treated as known and easily ascertainable interest holders to whom personal notice is due under the standards of the trilogy and of those prescribed by *Pope*.[20] Just as the landowners and the mortgage lender in *Mennonite*[21] were held entitled to a *personal post-delinquency* notice of a scheduled tax sale (to be conducted in order to satisfy the tax liability

*Schroeder, supra* note 3, 371 U.S. at 211, 83 S.Ct. at 282; *Riverside & Dan River Cotton Mills v. Menefee*, 237 U.S. 189, 35 S.Ct. 579, 59 L.Ed. 910 (1915); *Grannis v. Ordean*, 234 U.S. 385, 394, 34 S.Ct. 779, 783, 58 L.Ed. 1363, 1369 (1914); *Cate, supra* note 11, at 1356; *Bomford, supra* note 11, at 719. Due process requires adequate notice, a realistic opportunity to appear and the right to participate in a meaningful manner. Lack of notice constitutes a jurisdictional infirmity *Mullane, supra* note 2, 339 U.S. at 313–15, 70 S.Ct. at 656–57; *Cate, supra* note 11, at 1356; *Bomford, supra* note 11, at 718; *Pointer v. Hill*, 1975 OK 73, 536 P.2d 358, 361.

13. *Schroeder, supra* note 3, 371 U.S. at 212–13, 83 S.Ct. at 282–83; *Mennonite, supra* note 4, 462 U.S. at 798, 103 S.Ct. at 2711.

14. *Mennonite, supra* note 4, 462 U.S. at 798–99, 103 S.Ct. at 2711–2712; *Schroeder, supra* note 3, 371 U.S. at 212–13, 83 S.Ct. at 282–83; *Greene v. Lindsey*, 456 U.S. 444, 455, 102 S.Ct. 1874, 1881, 72 L.Ed.2d 249, 258–259 (1982); *Armstrong, supra* note 12, 380 U.S. at 552, 85 S.Ct. at 1191.

15. *Bomford, supra* note 11, at 715; *Cravens v. Corporation Commission*, 1980 OK 73, 613 P.2d 442, 444; *Harry R. Carlile Trust v. Cotton Petroleum Corp.*, 1986 OK 16, 732 P.2d 438, 443 n. 25; *Cate, supra* note 11, at 1356.

16. Rule 16, Rules of the District Courts, 12 O.S. 1991, Ch. 2, App., provides procedure to be followed before a judgment may be rendered against a defendant served solely by publication. *See Carlile, supra* note 15, at 443 n. 26. *The rule concretizes the standards of U.S. jurisprudence on*

the outer limit of publication service as a constitutionally permissible device for affording substitute notice. It specifies what kind of mailing must be effected, apart from publication, to afford *personal notice* that is required by *Mullane, supra* note 2.

17. 2 O.S.Supp.1997 § 3–50.9(L)(1).

18. 2 O.S.Supp.1997 § 3–50.9(L)(2).

19. For the terms of 2 O.S.Supp.1997 § 3–50.7(B)(20)(b), see *supra* note 9.

20. *See Tulsa Professional Collection Services v. Pope*, 485 U.S. 478, 490–91, 108 S.Ct. 1340, 1348, 99 L.Ed.2d 565 (1988), where after citing *Mennonite, supra* note 4, 462 U.S. at 800, 103 S.Ct. at 2712, the Court reasoned that a probate creditor's claim is considered a property interest protectible by the Due Process Clause. Upon weighing the probate creditor's interest in recovery against the state's interest in the speedy settlement of estates, *the Court held that known or reasonably ascertainable probate creditors, whose claims are not merely "conjectural," are entitled to actual notice of the deadline for submitting claims to the estate's representative. Id. See also Matter of Estate of Pope*, 1990 OK 125, 808 P.2d 640, 644.

21. *Mennonite, supra* note 4, 462 U.S. at 800, 103 S.Ct. at 2712. There, the Court held that *"a mortgagee's knowledge of delinquency in the payment of taxes is not equivalent to notice that a tax sale is pending." Id.* (emphasis supplied).

owed the county), so, too, the cotton growers' constitutional due here is to receive *timely personal notice* of a proceeding that *will afford them the very last chance to prevent the $5 million bonded indebtedness from becoming their individual assessment liability.*

¶ 7 OBWEO's failure to provide each eligible cotton grower with personal notice of this proceeding *plainly violates due process.* Because its vitiating defect has a jurisdictional dimension, this court may and is duty-bound to raise it *sua sponte.*[22]

## II

### DOES THE ASSESSMENT REFERENDUM CLAUSE OF THE BOLL WEEVIL ERADICATION ACT VIOLATE THE ONE–PERSON, ONE–VOTE EQUAL PROTECTION DOCTRINE BY CONFINING PARTICIPATION ONLY TO COTTON GROWERS?

¶ 8 There is another fundamental-law problem the court *must reach* in this case *anterior* to passing on the issues tendered. That one concerns the constitutional validity of the legislatively restricted franchise for participation in the referendum which gave rise to the bonded indebtedness. If that election was indeed constitutionally infirm, the bond issue before us today cannot be approved. *It may not be rested upon an enactment whose very foundation impermissibly restricts franchise.*

¶ 9 By the Fourteenth Amendment's command, no state may "deny to any person within its jurisdiction the equal protection of the laws." Amend. XIV, U.S. Const. In the context of state and local balloting, the Fourteenth Amendment guarantee means that in elections of general interest no voting restriction may be imposed other than that based on residence, age, or citizenship, unless, of course, the proponent of a more narrow (or constrictive) regime is able to demonstrate that the restriction is necessary to promote a compelling state interest.[23] This equal protection doctrine, known as the "one-person, one-vote" rule,[24] requires that any attempt *to dilute the value of votes*[25] or *to withhold the franchise*[26] from eligible voters in state or local elections is subject to *strict judicial scrutiny.* Federal constitutional jurisprudence has struck down election schemes

**22.** Jurisdictional inquiries into judicial cognizance may be considered and examined at any stage of the proceedings, either on motion or *sua sponte. Lincoln Bank and Trust Co. v. Okla. Tax Com'n,* 1992 OK 22, 827 P.2d 1314, 1318 n. 14; *Fields v. A & B Electronics,* 1990 OK 7, 788 P.2d 940, 941; *Hall v. Edge,* 1989 OK 143, 782 P.2d 122, 124; *Baylis v. City of Tulsa,* 1989 OK 90, 780 P.2d 686, 688; *April v. City of Broken Arrow,* 1989 OK 70, 775 P.2d 1347, 1355; *Snyder v. Smith Welding & Fabrication,* 1986 OK 35, 746 P.2d 168, 171; *Luster v. Bank of Chelsea,* 1986 OK 74, 730 P.2d 506, 508; *Matter of Initiative Petition Filed Nov. 15, 1983,* 1986 OK 13, 718 P.2d 1353, 1354; *Cate, supra* note 11, at 1356 n. 12; *Spain v. Kernell,* 1983 OK 105, 672 P.2d 1162, 1164–1165; *Woods Petroleum Corp. v. Sledge,* 1981 OK 89, 632 P.2d 393, 394; *Pointer, supra* note 12, at 361.

**23.** *Hill v. Stone,* 421 U.S. 289, 297, 95 S.Ct. 1637, 1643, 44 L.Ed.2d 172 (1975) (the Court found invalid state laws tying voting eligibility to property ownership in elections to approve issuance of bonds to finance a city library).

**24.** For over thirty years the equal protection clause of the Fourteenth Amendment has been consistently interpreted by the U.S. Supreme Court to require "one person, one vote" when electing officials of public entities with general governmental functions. *See, e.g., Gray v. Sanders,* 372 U.S. 368, 379–80, 83 S.Ct. 801, 808–09, 9 L.Ed.2d 821 (1963).

**25.** In the landmark case of *Reynolds v. Sims,* 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964), the Supreme Court announced that "as a basic constitutional standard, the Equal Protection Clause requires" that the seats in a state legislature "be apportioned on a population basis." *Id.* 377 U.S. at 568, 84 S.Ct. at 1385. This principle is based on the proposition that "people govern themselves through their elected representatives and that 'each and every citizen has an inalienable right to full and effective participation in the political processes.'" *Board of Estimate v. Morris,* 489 U.S. 688, 693, 109 S.Ct. 1433, 103 L.Ed.2d 717 (1989) (quoting *Reynolds, supra,* 377 U.S. at 565, 84 S.Ct. 1362). Later cases extended the scope of this doctrine to elections for units of local government. *Id.* 489 U.S. at 692–93, 109 S.Ct. at 1438; *Hadley v. Junior College District,* 397 U.S. 50, 54–55, 90 S.Ct. 791, 794, 25 L.Ed.2d 45 (1970); *Avery v. Midland County,* 390 U.S. 474, 480–81, 88 S.Ct. 1114, 1118, 20 L.Ed.2d 45 (1968) (the Court applied to municipalities the one-person, one-vote doctrine).

**26.** *Kramer, supra* note 5; *Cipriano, supra* note 6; *City of Phoenix v. Kolodziejski,* 399 U.S. 204, 90 S.Ct. 1990, 26 L.Ed.2d 523 (1970).

which restricted—to real property owners—participation in certain special elections. *Cipriano* [27] and *City of Phoenix* [28] declare that the "one person, one vote" principle governs residents of units of local governments exercising general governmental power. *Kramer* [29] extended the principle to school district elections. A very narrow exception to the rule came to be fashioned for elections that concern *special-purpose* units of government with a limited function, whose impact is found *disproportionately greater* on the few who are entitled to vote.[30]

¶ 10 I would first call on the applicant to inform us by brief that because the Act's assessment referendum provisions [31] do not impermissibly restrict the franchise for participation in that balloting, they do pass muster under the special-interest exception.

## III

## SUMMARY

¶ 11 Because in this case *service solely by publication* fails to meet the constitutional standard for notice prescribed by the *Mul-*

27. *Supra* note 6. The Court struck down a Louisiana law that restricted the franchise in *revenue bond elections* to property owners. *Id.* 395 U.S. at 706, 89 S.Ct. at 1900. *See also Police Jury of Parish of Vermilion v. Herbert*, 404 U.S. 807, 92 S.Ct. 52, 30 L.Ed.2d 39 (1971), summarily rev'g 258 La. 41, 245 So.2d 349 (in road improvement bond elections the franchise cannot be limited to property holders).

28. *Supra* note 26. In *City of Phoenix* the Court extended *Cipriano, supra* note 6, by striking down Arizona's law that limited suffrage in *general obligation bond elections* to property-owning taxpayers. The Court held that the interests of property owners and nonproperty owners in the bond issue were not sufficiently disparate to justify excluding those who own no real property. Not only did the persons excluded from voting have a great interest in approving or disapproving municipal improvements, the Court noted, but they also contributed to the servicing of bonds both *directly* through local taxes and *indirectly* through increased rents and costs. *Id.* 399 U.S. at 209–13, 90 S.Ct. at 1994–96.

29. On the same day that *Cipriano* was decided, the Court in *Kramer, supra* note 5, invalidated a New York statute restricting franchise in school district elections to those residents who owned or leased taxable real property within the district or had a child enrolled in the local school. Applying the strict scrutiny standard of review, the Court opined that any unjustified discrimination in determining who may participate in political affairs or in the selection of public officials undermines the legitimacy of representative government. *Id.* 395 U.S. at 627, 89 S.Ct. at 1890.

30. *Salyer Land Co. v. Tulare Lake Basin Water Storage District*, 410 U.S. 719, 93 S.Ct. 1224, 35 L.Ed.2d 659 (1973)(the Court approved limiting the franchise to landowners for choosing the board of directors of a local water storage district); *Ball v. James*, 451 U.S. 355, 370, 101 S.Ct. 1811, 1820, 68 L.Ed.2d 150 (1981)(extending the *Salyer* special-purpose exception to encompass a water district serving nearly half the population of the state, the Court notes that *"an aspect of that limited purpose is the disproportionate rela-*

*tionship the Districts functions bear to the specific class of people whom the system makes eligible to vote")*. The Court summarized the exception it had created in *Salyer* by stating that "the electorate of a special-purpose unit of government ... may be apportioned to give greater influence to the constituent groups found to be most affected by the governmental unit's functions." *Town of Lockport v. Citizens for Community Action at the Local Level, Inc.*, 430 U.S. 259, 266, 97 S.Ct. 1047, 1052–53, 51 L.Ed.2d 313 (1977).

The dissenters in *Salyer* respond that because the activities of the water district implicate the entire community, the franchise in water district board elections must be extended to all residents. *Salyer, supra,* 410 U.S. at 735, 93 S.Ct. at 1234 (Douglas, J., dissenting). The *Ball* dissenters, on the other hand, view the Court's opinion as *misapplying the limited-exception* recognized in *Salyer*. They point out that (a) the water district's broad authorization over the field of energy transcends the limited functions of the district in *Salyer;* and (b) the burdens of the water district in *Salyer* fell entirely on the landowners served by the district, but the financial burden in *Ball* had been shifted *from the landowners to all consumers of electricity*. *Ball, supra,* 451 U.S. at 375–76, 101 S.Ct. at 1823–24 (White, J., dissenting).

31. The pertinent terms of 2 O.S.Supp.1997 § 3–50.9 are:

"A. At the request of the board of directors, the Department shall provide for a referendum among cotton growers upon the question of whether an assessment shall be levied upon cotton growers in the state to offset the cost of boll weevil eradication.
 * * *
C. All cotton growers actively engaged in the production of cotton in the year of the calling of such referendum or who were actively engaged in production of cotton in any two (2) of the three (3) years immediately preceding the calling of the referendum shall be entitled to vote in any such referendum. The board of directors shall determine any questions of eligibility to vote.* * * "

*lane/Schroeder/Mennonite* trilogy, this court *is without jurisdiction* to proceed on the application pressed before it.

¶ 12 Anterior to adjudication of the issues tendered herein the court *must* decide whether the "assessment referendum" of the Act is valid. Franchise for participation in that referendum stands withheld from all qualified electors except only those who are eligible cotton growers with qualifications prescribed in 2 O.S. Supp.1997 § 3–50.9(C).[32] Whether that restriction is constitutionally valid should be resolved *after* inviting briefs that would inform us on the issue.

**32.** For the pertinent provisions of 2 O.S.Supp. 1997 § 3–50.9, see *supra* note 31.